**Rodney HOLDEN and Julie Holden, Plaintiffs,**

**v.**

**John BALKO, John Balko d/b/a Hearing Health Care Associates, and Industrial Audiological Services, Inc., Defendants.**

**No. IP 96–0949–C–H/G.**

United States District Court, S.D. Indiana, Indianapolis Division.

Dec. 26, 1996.

James D. Johnson, Mattingly, Rudolph, Fine & Porter, Evansville, IN, for plaintiffs.

Peter H. Pogue, Locke Reynolds Boyd & Weisell, Indianapolis, IN, for defendants.

## ENTRY ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

HAMILTON, District Judge.

Under Indiana common law, a tortfeasor cannot rely on a doctor's negligent treatment of the victim's injuries to avoid or reduce the tortfeasor's own liability, at least so long as the victim used reasonable care in selecting a doctor. *Whitaker v. Kruse,* 495 N.E.2d 223, 226 (Ind.App.1986); accord, *Suelzer v. Carpenter,* 183 Ind. 23, 107 N.E. 467, 470–71 (1915); Restatement (Second) of Torts § 457 (1965). Indiana, like most other states, treats the risks of medical treatment as foreseeable consequences of the wrong that caused the victim to need the medical treatment in the first place. The question in this diversity case is whether the Indiana Comparative Fault Act (Ind.Code § 34–4–33–1, *et seq.*) has superseded this doctrine of Indiana common law so as to permit a tortfeasor to reduce his own liability by asserting a nonparty defense against a doctor who negligently treated the injured person. The court concludes that the Comparative Fault Act did not modify or supersede the common law rule stated in *Whitaker v. Kruse.* Under Indiana law, an original tortfeasor may not use a nonparty defense under the Comparative Fault Act against doctors or others who provided allegedly negligent assistance to an injured person.

Plaintiffs Rodney and Julie Holden seek damages for alleged injuries suffered when Mr. Holden was fitted for custom ear plugs by defendants John Balko and employees of Hearing Health Care Associates and Industrial Audiological Services, Inc. Defendants have pleaded as an affirmative defense a nonparty defense under the Indiana Comparative Fault Act, Ind.Code § 34–4–33–10. That defense alleges that the doctor who treated Mr. Holden for the ear problem breached the applicable standard of care. Plaintiffs have filed a motion for partial judgment on the pleadings as to that defense. Both sides have filed affidavits in conjunction with the motion, so it has been converted to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. See Fed.R.Civ.P. 12(b).

### Summary Judgment Standard

■ A motion for partial summary judgment as to specific claims or issues may help narrow the issues in a case. The standard for summary judgment is the same regardless of whether the motion addresses the entire case or only a portion of it. A genuine issue of material fact exists if there is sufficient evidence for a jury to find in favor of the non-moving party on the particular issue. *E.g., Methodist Med. Ctr. v. American Med. Sec. Inc.,* 38 F.3d 316, 319 (7th Cir.1994). A party moving for summary judgment initially has the burden of showing the absence of any genuine issue of material fact in evidence of record. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). If the moving party carries this burden, the opposing party then must "go beyond the pleadings" and present specific facts to show that a genuine issue exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party is entitled to the benefit of all favorable inferences from the evidence, as long as they are reasonable. *Jones v. Merchants Nat'l Bank & Trust Co.,* 42 F.3d 1054, 1057 (7th Cir.1994). In this case, plaintiffs' motion presents a question of law particularly appropriate for resolution on a motion for summary judgment.

■ A motion for partial summary judgment as to an affirmative defense presents a relatively unusual twist on the summary judgment procedures that are the daily fare of the federal district courts. When a defendant pleads most affirmative defenses, the defendant asserts, in essence, that even if the material factual allegations in the complaint are true, the defendant intends to prove additional facts that will defeat or reduce the relief sought by the plaintiff. *E.g., Gwin v. Curry,* 161 F.R.D. 70, 71 (N.D.Ill.1995); *Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736–37 (N.D.Ill.1982); see generally 5 Charles Allen Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice & Procedure § 1270 at 411–14 (2d ed.1990). That general description certainly applies to a nonparty defense under the Indiana Comparative Fault Act asserting that another person is partially responsible for at least some of the plaintiff's injuries.[1] Therefore, for purposes of deciding the plaintiffs' motion for partial summary judgment on this affirmative defense, the court will assume (as the defendants assume for purposes of pleading the defense) that plaintiffs can prove the essential elements of their negligence claims against the defendants. Then, the court will consider the evidence relating to defendants' nonparty defense in the light most favorable to defendants, as the nonmoving parties.

### Undisputed Facts

Rodney Holden worked at Omco Cast Metals, Inc. in Winchester, Indiana. On May 10, 1995, John Balko and employees of Hearing Health Care Associates and Industrial Audiological Services, Inc. were on site at Omco to make custom ear mold impressions for Omco employees, including Mr. Holden. To create each custom ear mold impression, defendants inserted a foam sponge into an ear and then filled the ear cavity with a blue silicone material. The silicone material would fit the form of the individual ear. By use of an attached string, the sponge and silicone material would then be extracted from the ear for use as a mold to create custom ear plugs.

When one of defendants' employees extracted the form from Mr. Holden's ear, some of the silicone material leaked behind the sponge and remained in Mr. Holden's ear canal. Defendants, including Mr. Balko, attempted unsuccessfully to remove the silicone substance from Mr. Holden's ear. Mr. Holden was then referred to a hospital for removal of the remaining silicone substance. On May 11, 1995, Mr. Holden visited an ear, nose, and throat specialist ("ENT doctor") at a hospital. The next day, the ENT doctor surgically removed the silicone material from Mr. Holden's right ear.

---

1. As discussed in *Bobbitt,* 532 F.Supp. at 736–37, and Wright & Miller §§ 1270–71, the common law and code pleading history of affirmative defenses is full of complications and technical pitfalls that could trap the unwary defendant. Those complications are not present in this case, where the nonparty defense is so clearly an affirmative defense that assumes the plaintiffs can prove the material allegations in the complaint.

On July 3, 1996, Rodney and Julie Holden filed a negligence complaint against the defendants seeking damages for Mr. Holden's injuries and Mrs. Holden's loss of consortium. On September 3, 1996, defendants filed their answer including their nonparty defense, alleging that plaintiffs' claims were caused in whole or in part by a non-party, the ENT doctor, who is or could be liable to the plaintiffs for their damages and injuries pursuant to Ind.Code § 34–4–33–10. In responding to plaintiffs' motion, defendants have submitted an affidavit from another doctor asserting that the ENT doctor who treated Mr. Holden breached the applicable standard of care and that his breach proximately caused injuries to Mr. Holden. The ENT doctor who treated Mr. Holden is not a party to this action and has not yet been offered an opportunity to defend his treatment of Mr. Holden. Solely for purposes of deciding plaintiffs' motion for partial summary judgment, the court must assume that the ENT doctor's treatment of Mr. Holden was negligent and proximately caused some aggravation of Mr. Holden's injuries.

### Discussion

Plaintiffs' motion raises an issue that is, at its root, a matter of statutory interpretation. The question is whether and to what extent the Comparative Fault Act has superseded the common law rule that a tortfeasor cannot reduce his own liability by showing that those who came to the aid of the injured victim were negligent in providing that aid. This issue has not been addressed by the Indiana courts, nor have the parties directed the court's attention to cases in other states addressing the same issue under other comparative fault statutes. The court will consider first the role of the nonparty defense under the Indiana Comparative Fault Act and then the common law background against which the Comparative Fault Act was adopted. See generally *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.*, 578 N.E.2d 669, 673 (Ind.1991) (construing Com-

parative Fault Act strictly as a statute in derogation of the common law). The court will then turn to the arguments for the proposed interpretations of the Act as applied to this situation.

### I. *Indiana's Doctrine of Intervening Cause and the Nonparty Defense Under the Comparative Fault Act*

Indiana's Comparative Fault Act applies, with certain enumerated exceptions, to damages actions based on fault that accrued on or after January 1, 1985. Ind.Code § 34–4–33–1(a)(2). Medical malpractice actions are excluded from coverage and continue to be governed by the Medical Malpractice Act. Ind.Code § 34–4–33–1(a)(1). The Comparative Fault Act authorizes defendants to assert a defense that the claimant's damages were caused in full or in part by a nonparty. Ind.Code § 34–4–33–10. At the time of the events in question, the Act defined "nonparty" as follows: "a person who is, or may be, liable to the claimant in part or in whole for the damages claimed but who has not been joined in the action as a defendant by the claimant." Ind.Code § 34–4–33–2(a)(2) (West Supp.1994).[2] A defendant must affirmatively plead the nonparty defense, and the defendant carries the burden of proof on the defense. Ind.Code § 34–4–33–10(b). If a defendant knows of a nonparty defense when the first answer is filed, the defense must be asserted in the first answer. Ind.Code § 34–4–33–10(c). Defendants in this case satisfied these requirements by pleading the nonparty defense in their first answer.

The comparative fault system was aimed primarily at alleviating the harshness of the common law doctrine of contributory negligence, which could deny recovery to a slightly negligent plaintiff despite the defendant's culpable negligence. *Bowles v. Tatom*, 546 N.E.2d 1188, 1190 (Ind.1989). The Act seeks to achieve this result through a proportional allocation of fault that aims to ensure that each person whose fault contrib-

---

**2.** Effective July 1, 1995, the Indiana legislature amended the Act and adopted a new definition of "nonparty." Under the current version of the Act, nonparty means "a person who caused or contributed to cause the alleged injury, death, or damage to property but who has not been joined in the action as a defendant." Ind.Code § 34–4–33–2(a)(2) (West Supp.1996). This new definition applies prospectively only. *Chesnut v. Roof*, 665 N.E.2d 7, 10 (Ind.App.1996).

utes to cause an injury bears his or her proportionate share of the total fault that contributed to an injury. See *id.; Koziol v. Vojvoda,* 662 N.E.2d 985, 988 (Ind.App.1996). However, the Act does not require plaintiffs to name as defendants all parties who contribute to cause an injury. The nonparty defense permits a defendant to avoid being held solely responsible for injuries where other actors are also at fault by allowing fault to be apportioned to nonparties. See Lawrence P. Wilkins, *The Indiana Comparative Fault Act at First (Lingering) Glance,* 17 Indiana Law Review 687, 732 (1984). Without a nonparty defense, plaintiffs would be more likely to win full compensation and defendants would be more likely to shoulder the entire burden of all fault, even fault attributable to nonparties. *Id.* The nonparty defense, however, allows defendants to attribute fault to nonparties in order to reduce their share of liability. *Id.* at 734. The nonparty provision of the Comparative Fault Act "has significantly altered the distribution of the burden of plaintiff's injury and damages and has shifted a substantial risk of non-recovery to the plaintiff." Leonard D. Eilbacher, *Comparative Fault and the Nonparty Tortfeasor,* 17 Indiana Law Review, 903, 904 (1984).

Under the common law, the doctrine of intervening cause addressed some of the concerns about defendants bearing a disproportionate burden of liability for plaintiffs' injuries. The Court of Appeals of Indiana recently reviewed the common law doctrine of intervening cause in a case that addressed the effects the Comparative Fault Act has had on the doctrine:

Under common law, independent intervening conduct precludes the original wrongdoer's liability when the later conduct constitutes a cause interrupting the natural sequence of events, turning aside their course, preventing the natural and probable result of the original act or omission, and producing a result that could not have been reasonably anticipated. *Crull v. Platt* (1984), Ind.App., 471 N.E.2d 1211, *trans. denied.* It is generally for the jury to determine whether an intervening cause was such as to break the causal connection between defendant's act and the injury.

The essential element in reaching this determination is foreseeability. *McKinney v. Public Serv. Co. of Indiana, Inc.* (1992), Ind.App., 597 N.E.2d 1001, *trans. denied.*

*L.K.I. Holdings, Inc. v. Tyner,* 658 N.E.2d 111, 119 (Ind.App.1995). In *L.K.I. Holdings,* the court explained that the doctrine of intervening cause reflects, in essence, a policy determination to impose limits on the extent of a tortfeasor's liability for the consequences of the wrong. *Id.* See also *City of Portage v. Lindbloom,* 655 N.E.2d 84, 86 (Ind.App. 1995) (the requirement of foreseeability is directly related to the rule that an intervening cause may serve to cut off the liability of one whose original act sets in motion the chain of events leading to the injury; such intervening cause is not a concurrent or contributing cause but a superseding cause; if the intervening cause is foreseeable, the original tortfeasor cannot escape liability because of it; conversely, if the intervening cause is not foreseeable as a natural consequence of the original act, then the original tortfeasor cannot be held liable for injuries caused by the intervening action).

In *L.K.I. Holdings,* the Court of Appeals of Indiana held that the adoption of the comparative negligence standard, with its directions to apportion fault, rendered unnecessary the protection that the common law doctrine of intervening cause had provided tortfeasors from liability for the remote and unforeseeable consequences of their wrongs. 658 N.E.2d at 119. That case involved a collision at an uncontrolled intersection of a public street with a private road where a private construction company had placed a large mound of dirt that obstructed drivers' views. The construction company argued that the negligence of one driver in failing to yield the right-of-way was an intervening cause that excused it from any liability for wrongful placement of the mound of dirt. The appellate court held that the jury was properly asked to apportion fault between the negligent driver and the construction company. *Id.* at 120.

Thus, at common law, the intervening cause doctrine insulates tortfeasors from liability for the remote and unforeseeable con-

sequences of their actions. In most cases, whether the consequences of a defendant's acts were foreseeable is a question of fact. If the consequences were foreseeable, the defendant is held liable for all of the plaintiff's damages, including those damages that might also be attributable to a subsequent tortfeasor. If the consequences were not foreseeable, then the defendant is not held liable for any damages caused by a subsequent tortfeasor. The common law rule operates on an all-or-nothing basis when it is applicable. Under the Comparative Fault Act, however, juries may consider these same factors without having to reach an all-or-nothing decision. A jury may render a decision that apportions responsibility among those who have caused the victim's injuries.

## II. *Indiana Common Law Treatment of Subsequent Negligence by Doctors or Others Who Aid the Injured Person*

Although the common law doctrine of intervening cause allows a defendant to show that another tortfeasor should be held liable for at least some of the plaintiff's injuries, Indiana has not allowed tortfeasors to invoke that doctrine based on alleged negligence by those providing medical care or other reasonable forms of assistance to an injured person. The Indiana courts have adopted the rule set forth in § 457 of the Restatement (Second) of Torts:

> If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.

The Indiana case that addresses the subject in the most detail is *Whitaker v. Kruse*, 495 N.E.2d 223 (Ind.App.1986). In that case, which arose before the Comparative Fault Act took effect, the defendants admitted their negligence in causing a traffic accident but argued that the victim's injuries were aggravated by unnecessary and negligent medical treatment. Defendants did not argue that the victim improperly sought care or unreasonably selected her doctors. *Id.* at 224–25. The court explained that Indiana had adopted the principles stated in § 457 in *Suelzer v. Carpenter*, 183 Ind. 23, 107 N.E. 467, 470–71 (1915), and that those principles had also been applied by Indiana courts in *City of Goshen v. England*, 119 Ind. 368, 21 N.E. 977, 979 (1889), and *Joseph E. Seagram & Sons, Inc. v. Willis*, 401 N.E.2d 87, 89–92 (Ind.App.1980) (applying worker's compensation law). The court also explained the reasons for the doctrine:

> The rationale for permitting recovery under this rule is that the tort-feasor created the necessity for medical care in the first instance. So long as the individual seeking medical care makes a reasonable choice of physicians, he is entitled to recover for all damages resulting from any aggravation of his original injury caused by a physician's misdiagnosis or mistreatment. * * * Liability is imposed because it is reasonably foreseeable that medical care providers are human and capable of making mistakes. If the tort-feasor knows that his negligence may result in harm sufficiently severe to require medical treatment, he should also recognize the risk involved in submitting to medical treatment. Since he put the injured party in the position of needing medical services, the tort-feasor is responsible for any additional injury resulting from the medical treatment.

*Whitaker*, 495 N.E.2d at 225–26 (citations omitted). Indiana law also holds that a plaintiff's damages may be reduced if the plaintiff failed to obey a physician's instructions and aggravates injuries. The *Whitaker* court explained that if a tortfeasor were allowed to avoid liability for injuries aggravated when a victim sought medical treatment, "the injured party would be placed in the unenviable position of second-guessing his physicians in order to determine whether the doctor properly diagnosed the injury and chose the correct treatment. This court will not place innocent parties who have been injured by another's negligence in such a position." *Id.* at 226.

Although *Whitaker* provides the most detailed discussion of the principles set forth in § 457, those principles are securely anchored

in Indiana law through *Suelzer v. Carpenter,* *supra,* as well as *Brownell v. Figel,* 950 F.2d 1285, 1294 (7th Cir.1991), where the Seventh Circuit applied the principles of *Whitaker* and *Suelzer* in a civil rights case alleging deliberate indifference to the medical needs of a person in police custody.

### III. *Restatement § 457 and the Nonparty Provisions of the Comparative Fault Act*

Against this background of the common law, the question is whether the Comparative Fault Act now permits a defendant in a comparative fault case to assert a nonparty defense naming a doctor or other person who came to the aid of the injured person and provided allegedly negligent care. Defendants argue that the ENT doctor who treated Mr. Holden falls within the plain language of the definition of a nonparty: "a person who is, or may be, liable to the claimant in part or in whole for the damages claimed but who has not been joined in the action as a defendant by the claimant." Ind.Code § 34–4–33–2(a)(2) (1994). They also contend that the rule stated in § 457 and *Whitaker v. Kruse* is merely a specific example of the doctrine of intervening cause which, as defendants read *L.K.I. Holdings,* has been replaced by the Comparative Fault Act. Finally, they contend that the Comparative Fault Act includes several specific exceptions to the nonparty defense, which shows that the Indiana legislature chose not to provide an exception for doctors and others who come to the aid of an injured person. Plaintiffs argue in response that the policies supporting § 457 have not been affected by the Comparative Fault Act and that adoption of defendants' position would cause dramatic changes in Indiana tort law and practice that would undermine other important public policies. Accordingly, they contend that the Act should be construed as not authorizing nonparty defenses naming physicians and others who have come to the foreseeable aid of the injured plaintiff.

■ The court agrees with plaintiffs that the Comparative Fault Act did not change the settled law in Indiana consistent with § 457 of the Restatement (Second) of Torts.

The court bases this conclusion on several considerations. Although none is necessarily conclusive by itself, cumulatively they weigh heavily against the defendants' arguments. First, although the legislature obviously could have chosen to permit such nonparty defenses naming doctors or others who give aid, nothing in the language or apparent purposes of the Comparative Fault Act shows any specific intention to accomplish that result. Second, the policy considerations that support § 457 have not been altered at all by the Comparative Fault Act. They remain as valid and persuasive as ever. Third, adoption of the defendants' position in this case would produce significant, and generally corrosive, effects on the relationships between injured persons and those who come to their aid, including doctors, as well as on tort law and practice in general and medical malpractice litigation in particular. It is highly unlikely that the legislature intended the Act to be interpreted to cause such consequences. Finally, although comparative fault laws have been in effect in many states for many years, the defendants have not identified any case in any state that has agreed with their approach. At the same time, the Supreme Court of Indiana has cautioned that, to the extent the Comparative Fault Act is in derogation of the common law, it must be construed narrowly so as not to bring about unintended and radical changes in tort law and practice. To explain these points further:

1. The language of the statutory definition of a "nonparty" is broad enough to permit a reading that would reach those who negligently give aid, including medical care, to an injured victim of a tort. However, nothing in the language or apparent purposes of the Comparative Fault Act specifically requires the result that defendants seek here or shows any intention by the legislature to achieve such a result. The principal goal of the Comparative Fault Act was to cushion the sometimes harsh effects of the common law rule of contributory negligence, which could deny any recovery at all to an injured plaintiff whose own negligence made even a slight contribution to the accident or injury. *Indianapolis Power & Light,* 578 N.E.2d at 672. There simply is no specific

indication in the Act that the legislature intended to offer to tortfeasors a new way to avoid or reduce liability by shifting responsibility to those who came to the aid of the injured person. The position advocated by plaintiffs here—leaving untouched the doctrine set forth in § 457 of the Restatement—leaves tortfeasors no worse off than they were under the common law.

2. In *Whitaker v. Kruse,* the Court of Appeals of Indiana explained the compelling policy reasons for adopting the rule in § 457 of the Restatement, as discussed above. The defendants' position in this case would put injured persons in precisely the same "unenviable position of second-guessing his physicians in order to determine whether the doctor properly diagnosed the injury and chose the correct treatment" that the court rejected in *Whitaker.* See 495 N.E.2d at 226. The *Whitaker* court rejected the position "because of the hardship it imposes on the injured party." *Id.* Adoption of the Comparative Fault Act did nothing to address or alleviate any of those concerns. Thus, without much clearer indications that the legislature intended to do so, the Act should not be construed as having reversed the common law rule where it did not also address in some way the compelling policies that support that rule.

3. Plaintiffs argue that adoption of the defendants' position would have serious, even radical, consequences for tort law and practice in Indiana and would undermine doctor-patient relationships. Although it is not possible to quantify those consequences, plaintiffs' position is sound. If defendants were correct, Indiana law would, for the first time, put injured plaintiffs in the "unenviable position" described in *Whitaker* of having to second-guess their treating physicians for the financial benefit of the original tortfeasor. If defendants were correct, Indiana law would also, for the first time, give a private litigant other than a doctor's patient or the patient's legal representative the ability to put on trial the quality of a doctor's care of that patient. In most cases, the original tortfeasor will be a complete stranger to that doctor-patient relationship and will have a purely financial interest in challenging the doctor's care of the patient.

The threat of such a challenge by a stranger to the doctor-patient relationship could reasonably be expected to have significant effects on doctor-patient relationships, especially in emergency care situations. Doctors treating victims of traffic accidents or other torts would know that a stranger would have a financial incentive—often an enormous financial incentive—to scour the patient's treatment records in hopes of finding some arguable basis for asserting that the doctor's care failed to meet the applicable standard of care. Doctors could also reasonably expect that the strangers would often have access to the substantial financial, legal, and investigative resources of an insurance company that would have an interest in using the threat of litigation to squeeze financial contributions from the doctor or the doctor's insurer even where the claim of negligence seemed relatively weak.[3] This prospect could only serve to raise substantially the costs of medical care—and especially for emergency care of the injured. It might even discourage some doctors and other health care providers from providing such care. The Supreme Court of Indiana has recognized that public policy counsels against jeopardizing the doctor-patient relationship. *E.g., Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514, 518 (Ind. 1994). Discouraging emergency care would also contravene Indiana's public policy of encouraging doctors to provide emergency care. See *Beckerman v. Gordon,* 618 N.E.2d 56, 57 (Ind.App.1993) (the "sudden emergency doctrine" applies a less stringent standard of care to physicians and individuals responding to emergencies not of their own making); see also *Compton v. Pletch,* 580 N.E.2d 664 (Ind.1991) (sudden emergency doctrine remains viable under Comparative Fault Act). The Comparative Fault Act should not be construed to produce such results without clearer indications in the legislative language

**3.** Although the Comparative Fault Act would not allow the tortfeasor to bring the doctor into the litigation directly as a party-defendant, merely pleading a nonparty defense against a doctor would put substantial pressure on the plaintiff to add the named nonparty doctor as a defendant.

than can be found in the Act.[4]

Adopting the defendant's position would also be likely to cause substantial delays and complications in personal injury litigation in Indiana. Whenever a defendant named a doctor or other health care professional in a nonparty defense, the plaintiff would need to decide whether to add that person as a defendant. The risk of not adding the new defendant, of course, would be undercompensation for injuries if the original defendant could show that the doctor was negligent and that the negligence was a proximate cause of some of the plaintiff's injuries. Where a plaintiff names as defendants both a "qualified health care provider" as that term is used in the Indiana Medical Malpractice Act, Ind.Code § 27–12–1–1, et seq., and other defendants who are not qualified health care providers, the Comparative Fault Act provides for "reasonable delays in the action brought against those defendants who are not qualified health care providers until the medical review panel procedure can be completed as to the qualified health care providers." Ind.Code § 34–4–33–11.[5] Then, after completion of the statutory medical review panel process, the court must permit joinder of the qualified health care provider as an additional defendant. Id. Thus, where a plaintiff responded to a nonparty defense by adding his doctor as a defendant, as many would feel compelled to do simply to protect their ability to recover fully for their injuries, the result would be substantial delays in all the litigation while the medical review panel process went forward. A plaintiff may choose to take this path now, of course. But adopting defendants' construction of the Comparative Fault Act would enable defendants to force this unpalatable choice—between unnecessary delay and the risk of incomplete recovery—upon plaintiffs in virtually any case.[6]

Also, the court must recognize that the natural and likely result of adopting defendants' position in this case would be a substantial increase in the volume of medical malpractice litigation *even in cases where plaintiffs did not actually believe their doctors were negligent.* Such claims would often be a predictable, prudent, and cautious response to a defendant's assertion of a nonparty defense against a doctor so long as the defense appeared to have any arguable basis. In view of the Indiana legislature's significant statutory measures to prevent baseless medical malpractice litigation, it is extremely unlikely that the legislature intended to allow defendants to use this nonparty defense concerning health care providers.[7]

---

4. Restatement § 457 is not limited to medical care providers. It also applies to any persons "rendering aid" that the injury reasonably requires. Thus, without the protection of § 457, each time an ordinary citizen comes to the aid of an accident victim, she would run the risk of being named in a nonparty defense and becoming entangled in any subsequent litigation. Defendants' construction of the Act would tend to encourage ordinary citizens to look the other way rather than aid injured persons and risk entangling themselves in litigation. Such an outcome, which could easily result from one or two well publicized cases, would conflict with Indiana's stated public policy of encouraging persons to come to the aid of others. See *J.A.W. v. Roberts,* 627 N.E.2d 802, 809 (Ind.App.1994) ("As a civil society we certainly encourage third parties and bystanders to aid the helpless, the homeless, and victims of catastrophe. *See, e.g.,* Ind.Code § 34–4–12–1 (commonly referred to as the "good samaritan statute" which encourages persons to render emergency care to accident victims).").

5. Before most medical malpractice actions can even be filed in court, the plaintiff must submit the claim to a medical review panel pursuant to

Ind.Code § 27–12–10–1, et seq. See Ind.Code § 27–12–8–4 (requiring review panel opinion before action is filed).

6. Evidence presented to the courts in *Cha v. Warnick,* 476 N.E.2d 109, 110 (Ind.1985), showed that the average time to complete the medical review panel process was nearly two years.

7. The Indiana legislature adopted the Medical Malpractice Act as a response to a perceived "crisis in the ability of health care providers to obtain medical malpractice insurance coverage ... and thus to continue providing health care services to the public." *Winona Mem'l Found. v. Lomax,* 465. N.E.2d 731, 739 (Ind.App.1984) (citation and footnote omitted). Medical malpractice claims in Indiana continue to be governed by the common law of contributory negligence because the Indiana legislature expressly excepted medical malpractice cases from coverage under the Comparative Fault Act. Ind.Code § 34–4–33–1(a)(1).

4. Also significant here is the lack of case law from Indiana and from other states that have enacted comparative fault legislation. Indiana's Comparative Fault Act has been in effect for more than ten years, and the Indiana legislature was not on the leading edge of the movement to enact such legislation. Defendants have not directed the court's attention to any cases in other states permitting nonparty defenses naming doctors or others who would fall within the scope of § 457 of the Restatement. In view of the significance of the issue and the broad sweep of the approach the defendants seek in this case, this absence of applicable precedent after a number of years provides additional grounds for concluding that the legislature did not intend to adopt this approach by enacting the Comparative Fault Act.

The shift away from the common law rule of contributory negligence to comparative fault was the central change wrought by the Comparative Fault Act, and it was indeed a dramatic change in Indiana law. The Supreme Court of Indiana has indicated that litigants seeking to find other dramatic changes implicit in the Act are swimming upstream. The court has treated the Act as one in derogation of the existing common law that must be strictly construed by the courts. *Indianapolis Power & Light Co.*, 578 N.E.2d at 673. "It is well settled that the legislature does not intend by a statute to make any change in the common law beyond what it declares either in express terms or by unmistakable implication." *Id.* (citation omitted); accord, *Anderson v. P.A. Radocy & Sons, Inc.*, 67 F.3d 619, 623 (7th Cir.1995) (following this principle as stated in *Indianapolis Power & Light* and holding that Comparative Fault Act did not abrogate "open and obvious danger" rule in product liability actions based on negligence). In *Indianapolis Power & Light*, the court rejected an interpretation of the Act that would have effected a change in Indiana tort practice comparable in magnitude to that sought by defendants in this case. The issue there was whether the Act permitted a tortfeasor to bring a third-party claim for indemnification against the plaintiff's employer, who was otherwise exempt from liability except through the Worker's Compensation Act. The Court of Appeals had recognized such a third-party claim for indemnification. In language that provides a significant guide for this case, the Supreme Court said:

We agree with Snodgrass that, if left undisturbed, the decision of the Court of Appeals on this point would result in a radical change in Indiana tort practice. In almost every work-related accident, the employer of the injured party would be joined as a third-party defendant in a common law implied indemnity claim even absent an express contractual indemnity agreement.

*Indianapolis Power & Light*, 578 N.E.2d at 673. The court declined to find such a "radical change in Indiana tort practice" implied in the Act. Like the Supreme Court of Indiana in *Indianapolis Power & Light*, this court declines to find a different radical change in Indiana tort practice implied in the Act. Restatement § 457 has continuing vitality under the Comparative Fault Act.

The Court of Appeals decision relied upon by defendants, *L.K.I. Holdings*, 658 N.E.2d 111, does not require a contrary result. In that case the court held that determinations of intervening cause had been incorporated into the comparative fault system. *Id.* at 120. Nothing in the court's opinion or reasoning suggests that it meant to address the continuing vitality of § 457 and *Whitaker v. Kruse*. In fact, the rule of § 457 has been treated not so much as part of the doctrine of intervening cause but more as a boundary that fenced in or limited the doctrine of intervening cause. Section 457 effectively provides that a particular type of perhaps arguably "intervening" cause will not be treated as an intervening cause. That rule is a matter of policy more than a matter of abstract legal logic. Nothing in *L.K.I. Holdings* reflects any consideration of, or intent to undermine, those policies that come into play when doctors or others give aid to an injured person.

If defendants are found negligent, Restatement § 457 will apply to this case. Their alleged negligence created the necessity for Rodney Holden to seek treatment from the ENT doctor, and they do not argue that Mr.

Holden unreasonably sought medical care or unreasonably selected his health care provider. Under Restatement § 457, any injuries resulting from the ENT doctor's treatment are, as a matter of law, the foreseeable result of any negligence on the part of defendants. Defendants' nonparty defense naming the doctor fails as a matter of law, and plaintiffs' motion for summary judgment as to the defendants' first affirmative defense is hereby GRANTED.

So ordered.