1999-NMSC-029

987 P.2d 386

**Francisco J. TORRES and Sonia A. Torres, his wife, Plaintiffs–Appellants,**

v.

**EL PASO ELECTRIC COMPANY, Defendant–Appellee.**

No. 24,300.

Supreme Court of New Mexico.

June 30, 1999.

T.O. Gilstrap, Jr., El Paso, TX, Pickett & Associates, Lawrence M. Pickett, Las Cruces, for appellants.

Law Office of T.A. Sandenaw, Leonard J. Piazza, Thomas A. Sandenaw, Jr., Las Cruces, Small, Craig & Werkenthin, P.C., Aldean E. Kainz, Jeffrey T. Knebel, Austin, TX, for appellees.

## OPINION

SERNA, Justice.

{1}  Plaintiffs–Appellants Francisco Torres and Sonia Torres filed a personal injury action against Defendant–Appellee El Paso Electric Company (EPEC) in the district court. The Torreses appeal from a directed verdict in favor of EPEC on a claim of intentional spoliation of evidence, from a directed verdict in favor of EPEC on a claim for punitive damages, and from a jury verdict and judgment in favor of EPEC on claims of negligence and loss of consortium.

{2}  Upon certification of the matter to this Court from the Court of Appeals, we hold that the affirmative defense of independent intervening cause does not apply to the negligent actions of a plaintiff. In addition, we conclude that, because the jury instruction on independent intervening cause creates the possibility of jury confusion and is significantly duplicative of the jury instruction on proximate cause, it is no longer an appropriate instruction for cases involving multiple acts of negligence. We also conclude that the doctrine of independent intervening cause is inapplicable to the present matter. As a result, we hold that the jury instruction on this affirmative defense constituted reversible error, and we vacate the judgment in favor of EPEC on the negligence claim.

{3}  With respect to the directed verdicts in favor of EPEC, we reverse the district court's directed verdict on the claim for punitive damages due to cumulative actions by EPEC employees giving rise to a reasonable inference of recklessness in the management of an inherently dangerous activity. Finally, we affirm the directed verdict on the claim of spoliation of evidence because, although we hold that tortious spoliation may occur prior to the filing of a complaint, we conclude that Torres failed to demonstrate a malicious intent to disrupt his lawsuit. We remand for a new trial on the negligence claim and on punitive damages.

## I. Facts

{4}  On July 31, 1992, Francisco Torres's employer, Aldershot of New Mexico, Inc., was in the process of replacing a roof over its greenhouse in Las Cruces, New Mexico. Torres assisted in the installation of the new roof as one of his job duties. While standing in a gutter on the edge of the greenhouse roof and being handed a long metal rod from another Aldershot employee, Torres contacted a high voltage conductor, which was above and behind him, with the metal rod. His contact with the power line caused Torres to fall to the ground outside of the greenhouse. Torres suffered serious injuries, including severe electrical burns and an amputated left foot. At trial, EPEC and Torres stipulated the amount of Torres's medical expenses as $196,808.42.

{5}  Torres alleged that EPEC negligently installed and maintained a high voltage power pole adjacent to the greenhouse and that EPEC's negligence proximately caused Torres's contact with the power conductor. EPEC installed the pole in 1981. Torres alleged that the pole was bent and that EPEC, at the time of installation, leaned the pole toward the greenhouse to offset the weight of the conductor. After installation, the pole shifted several feet towards the greenhouse, and the cross-arm of the pole tilted down toward the greenhouse. Additionally, the pole had several cracks, running

both horizontally and vertically, and appeared to be twisted. Torres alleged that several individuals warned EPEC about the condition of the pole and the line's proximity to the greenhouse but that EPEC took no action to alleviate the problem.

{6} Torres also alleged that EPEC's investigation of the accident was suspect. According to Torres, an EPEC representative, after conferring with counsel, had the pole removed, cut into sections, and discarded. EPEC had a policy to preserve evidence in cases of serious electrical contact and, in fact, saved and labeled the transformers that had been on the pole. While EPEC provided measurements of the distance between the conductor and both the ground and the pole, Torres alleged that EPEC's removal of the pole prevented an accurate measurement of the distance from the conductor to the greenhouse, a measurement that EPEC did not provide. Although a former EPEC employee testified that he saw an EPEC representative take a measurement from the power conductor to the building prior to the pole's removal, EPEC's records did not reflect that measurement and EPEC employees denied that such a measurement had been taken. Additionally, even though an EPEC employee measured the distance between the conductor and the greenhouse prior to the accident due to the warnings EPEC had received, EPEC was unable to produce that measurement at trial. Finally, Torres alleged that an EPEC employee changed another employee's measurements of the point of electrical contact on the metal rod that Torres had been holding, which had the result of making the conductor appear to be more distant from Torres and the greenhouse at the time of the accident.

{7} At the close of Torres's case-in-chief, EPEC moved for a directed verdict. *See* Rule 1–050(A) NMRA 1999. The trial court determined that EPEC did not have "any intention to harm anybody" and did not act in a sufficiently willful or wanton manner to form the basis for punitive damages. Additionally, the trial court determined that Torres failed to show that EPEC had knowledge of a lawsuit at the time that it discarded the power pole. The trial court also determined

that EPEC did not intend to deprive Torres of evidence. As a result, the trial court granted EPEC's motion for a directed verdict with respect to Torres's claim for punitive damages and his claim of intentional spoliation of evidence.

{8} Following the presentation of evidence on Torres's negligence claim, the trial court instructed the jury on the affirmative defense of independent intervening causes. EPEC claimed that, if it had been negligent, the negligence of Torres, Aldershot, and Aldershot's contractors, L.E. Electric, Inc. and Beukel Greenhouse Services (Beukel), superseded EPEC's negligence and, therefore, constituted independent intervening causes which relieved EPEC of liability. The jury returned a special verdict finding that EPEC had been negligent but that EPEC's negligence had not proximately caused Torres's injuries.

{9} On appeal to the Court of Appeals, Torres argued that the trial court erred in weighing the evidence by granting EPEC's motion for directed verdict on the claim for punitive damages and the claim of intentional spoliation of evidence. In addition, Torres argued that the trial court erred in instructing the jury on the affirmative defense of independent intervening causes. Finally, Torres argued that the trial court's jury instructions, particularly instruction number four concerning affirmative defenses, impermissibly commented on the evidence. The Court of Appeals, recognizing a potential conflict between the defense of independent intervening cause and New Mexico's adoption of comparative negligence, certified the issue "of the continuing viability of the independent intervening cause [jury] instructions and, if viable, the circumstances in which they should be given," as a matter of substantial public importance. *See* NMSA 1978, § 34–5–14(C)(2) (1972) (stating this Court's appellate jurisdiction over certified matters from the Court of Appeals). We accepted certification and now address each of Torres's claims. *See Collins ex rel. Collins v. Tabet,* 111 N.M. 391, 404 n. 10, 806 P.2d 40, 53 n. 10 (1991) (construing Section 34–5–14(C) as vesting in this Court appellate jurisdiction over "the entire case in which the

appeal is taken" upon certification from the Court of Appeals).

## II. Independent Intervening Cause

{10} In the trial court, EPEC argued to the jury that the actions of Torres, his employer, Aldershot, and Aldershot's contractors proximately caused Torres's injuries. Specifically, EPEC claimed that Torres was aware of the location of the wire and its potential danger and that he failed to exercise ordinary care in replacing the greenhouse roof. EPEC also claimed that Aldershot negligently placed Torres in a dangerous position without adequate training and that Aldershot violated regulations of the Occupational Safety and Health Administration by: (1) failing to inform Torres of the location of the power lines; (2) failing to tell him to stay out of the lines; (3) failing to tell him the consequences of contact with the lines; (4) failing to erect appropriate warning signs; (5) failing to take steps to prevent Torres from falling off the roof; and (6) failing to have the lines de-energized. Allen Clapp, EPEC's engineering expert, testified that the accident would not have occurred if Aldershot had complied with OSHA regulations. Finally, EPEC claimed that Beukel, an expert glass installer hired by Aldershot to assist in the roofing project, and L.E. Electric, Aldershot's electrical contractor, proximately caused Torres's injuries by not advising Aldershot to take precautions such as de-energizing the lines.

{11} Based on these contentions, EPEC requested that the trial court give the uniform jury instruction dealing with independent intervening causes, UJI 13–306 NMRA 1999. Although Torres objected to the instruction, contending that there was "no evidence to support any independent intervening cause in this case," the trial court included UJI 13–306 in its instructions to the jury.[1]

{12} An independent intervening cause is "a cause which interrupts the natural sequence of events, turns aside their cause, prevents the natural and probable results of the original act or omission, and produces a different result, that could not have been reasonably foreseen." *Thompson v. Anderman*, 59 N.M. 400, 411–12, 285 P.2d 507, 514 (1955); *accord* UJI 13–306 (defining independent intervening cause as a cause that "interrupts and turns aside a course of events and produces that which was not foreseeable as a result of an earlier act or omission"); *see* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 44, at 301 (5th ed. 1984) ("An intervening cause is one which comes into active operation in producing the result *after* the negligence of the defendant."). On appeal, Torres contends that the trial court erred in giving UJI 13–306 because the acts of Torres, Aldershot, Beukel, and L.E. Electric fail to satisfy the definition of an independent intervening cause. In reviewing this contention, the Court of Appeals noted a possible inconsistency between the doctrine of independent intervening cause and New Mexico's scheme of apportioning fault in negligence actions and questioned whether the doctrine of independent intervening cause "unduly emphasize[s] one portion of the case."

{13} In *Scott v. Rizzo*, 96 N.M. 682, 683, 634 P.2d 1234, 1235 (1981), this Court, adopting an opinion by the Court of Appeals, eliminated the harsh common-law rule barring recovery by plaintiffs for their contributory negligence and substituted comparative negligence in its place. Specifically, we adopted a form of pure comparative negligence in which the jury apportions fault, regardless of degrees of fault, between the plaintiff and the defendant. *Id.* at 689–90, 634 P.2d at 1241–42. As a natural corollary to the adoption of comparative negligence in *Rizzo*, the Court of Appeals subsequently abolished joint and several liability, under which, among multiple defendants, each de-

---

1. We reject Torres's argument that the jury instructions improperly commented on the evidence. There was nothing in the instructions constituting conclusion, argument, or unnecessary information. *See* UJI 13–302D NMRA 1999 (discussing the defendant's burden of proof for establishing an affirmative defense and directing that "each claimed act, omission, or condition, etc., referenced to the specific party or nonparty, which is supported by substantial evidence" be listed).

fendant, regardless of proportion of fault, had been liable for one hundred percent of a plaintiff's damages. *Bartlett v. New Mexico Welding Supply, Inc.*, 98 N.M. 152, 158–59, 646 P.2d 579, 585–86 (Ct.App.1982); *see* NMSA 1978, § 41–3A–1 (1987) (adopting several liability with a limited number of exceptions). In doing so, the Court of Appeals concluded that a jury is able to apportion both fault and causation among multiple negligent acts or omissions resulting in a single injury. *Bartlett*, 98 N.M. at 158, 646 P.2d at 585 ("We are unwilling ... to say that although fault may be apportioned, causation cannot. If the jury can do one, it can do the other."). Additionally, the rise of comparative negligence and the demise of contributory negligence has had an effect on associated doctrines. *See Dunleavy v. Miller*, 116 N.M. 353, 359, 862 P.2d 1212, 1218 (1993) (holding that "the instruction on sudden emergency is unnecessary and potentially confusing and serves to overemphasize one portion of the case" and noting the abolition of unavoidable accident, last clear chance, and open and obvious danger). *See generally Scott*, 96 N.M. at 687, 634 P.2d at 1239 ("Under comparative negligence, rules designed to ameliorate the harshness of the contributory negligence rule are no longer needed."). Prior to this case, however, we have not resolved the effect of comparative negligence on the doctrine of independent intervening cause. *See Govich v. North Am. Sys., Inc.*, 112 N.M. 226, 232–33, 814 P.2d 94, 100–01 (1991) (discussing independent intervening cause generally but focusing on the effects of comparative negligence on the common law rescue doctrine); *Richardson v. Carnegie Library Restaurant, Inc.*, 107 N.M. 688, 701, 763 P.2d 1153, 1166 (1988) (mentioning *Scott* in the context of a discussion on independent intervening cause, namely, a criminal act, but not resolving the issue).

{14} The doctrine of independent intervening cause did not originate in response to contributory negligence; rather, the doctrine reflects traditional notions of proximate causation and the need to limit potentially limitless liability arising from mere cause in fact. *See generally* Keeton et al., *supra*, § 44, at 302 ("In the effort to hold the defendant's liability within some reasonable bounds, the courts have been compelled, out of sheer necessity and in default of anything better, to fall back upon the scope of original foreseeable risk which the defendant has created."). Independent intervening cause is a question of policy, foreseeability, and remoteness. *See id.* at 301–02; 4 Fowler V. Harper et al., *The Law of Torts* § 20.5, at 147–50 (2d ed.1986). Importantly, the doctrine is thus not limited to the negligent acts of multiple tortfeasors or the negligence of the plaintiff but also may include intentional tortious or criminal acts of third parties as well as forces of nature. As with the sudden emergency doctrine, then, the doctrine of independent intervening cause is not "as clearly incompatible with comparative negligence" as the defenses of last clear chance and open and obvious danger. *Dunleavy*, 116 N.M. at 358, 862 P.2d at 1217.

{15} Nonetheless, to a certain extent, courts have shaped the doctrine of independent intervening cause in response to the harshness of contributory negligence and the potential unfairness of joint and several liability.[2] In this regard, "[t]he doctrine of intervening cause is not so strong as it seems to have been at one time." *O'Brien v. B.L.C. Ins. Co.*, 768 S.W.2d 64, 68 (Mo.1989) (en banc). With respect to contributory negligence, courts have sometimes labeled a defendant's negligent act an independent intervening cause when a plaintiff's negligence would have been a complete bar to recovery, even though both acts could be characterized as proximate causes of the injury. *See* Terry

---

**2.** Due to the broad scope of the doctrine of independent intervening cause, we expressly limit our analysis of its relationship to comparative negligence to those negligent acts or omissions by a third party or the plaintiff that are causes in fact of the plaintiff's injury; our analysis does not extend to intentional tortious or criminal acts or forces of nature. *See City of Belen v. Harrell*, 93 N.M. 601, 603–04, 603 P.2d 711, 713–14 (1979)

(discussing suicide while in the custodial care of the defendant); *Bouldin v. Sategna*, 71 N.M. 329, 333, 378 P.2d 370, 373 (1963) ("We do not perceive theft of a car as a natural event to be foreseen by a person who is negligent in leaving his car unattended with the key in the ignition."); *see also Richardson*, 107 N.M. at 699–701, 763 P.2d at 1164–66 (discussing *Bouldin* ).

Christlieb, Note, *Why Superseding Cause Analysis Should Be Abandoned*, 72 Tex. L.Rev. 161, 165–66 (1993). Courts have also relied on the doctrine of independent intervening cause to relieve a defendant of complete liability in situations in which a third party's negligence is grossly disproportionate in causing the plaintiff's injury, even though, again, both acts of negligence may be characterized as a proximate cause of the plaintiff's injury. *See Holden v. Balko*, 949 F.Supp. 704, 708–09 (S.D.Ind.1996) (discussing the relationship of the intervening cause doctrine and the "all-or-nothing" approach of the common-law rule of joint and several liability); Christlieb, *supra*, at 165 (classifying superseding causes under three general types, defining an "absorbing cause" as one "that, for one reason or another, is judged to be much more at fault than the other proximate cause," and stating that this type of superseding cause "has no logical use under comparative [negligence] systems"); *see also Hercules, Inc. v. Stevens Shipping Co.*, 765 F.2d 1069, 1075 (11th Cir.1985) (stating that the doctrine of intervening cause "operated in maritime collision cases to ameliorate the harsh effects of the so-called 'divided damages' rule, under which damages were divided evenly between negligent parties"). We believe that such an expansive application of the doctrine of independent intervening cause to negligent acts is inconsistent with New Mexico's system of pure comparative fault.

■ {16} In negligence actions, plaintiffs must prove to the jury that a defendant's breach of duty proximately caused their injuries. *See* UJI 13–302B NMRA 1999. Regardless of the issue of independent intervening cause, trial courts must give the following jury instruction on proximate cause:

A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred. It need not be the only cause, nor the last nor nearest cause. It is sufficient if it occurs with some other cause

acting at the same time, which in combination with it, causes the injury.

UJI 13–305 NMRA 1999 (brackets in original). If the jury determines that the defendant's act proximately caused the plaintiff's injuries in combination with the negligence of another, including the plaintiff, then it must apportion fault between the concurrent tortfeasors. *See* UJI 13–2218 NMRA 1999 (discussing comparative negligence by the plaintiff); UJI 13–2219 NMRA 1999 (discussing a jury finding that the "plaintiff's injury was proximately caused by a combination of negligence of more than one person").

■ {17} The independent intervening cause instruction, UJI 13–306, and the bracketed language in UJI 13–305 referring to an independent intervening cause do not change the meaning of proximate cause. Rather, they are intended to clarify the meaning of proximate cause in cases in which there is evidence from which reasonable minds could differ in deciding whether an unforeseeable cause has broken the chain of causation. A finding of an independent intervening cause represents a finding against the plaintiff on proximate cause or, in other words, a finding that the defendant's act or omission did not, in a natural and continuous sequence, produce the injury. Independent intervening cause, in contrast to comparative negligence, constitutes a complete defense.

■ {18} Given the jury's consideration of proximate cause, on which the plaintiff bears the burden of proof, and the jury's comparison of the defendant's negligence with the comparative negligence of a plaintiff, we conclude that, in cases in which a defendant alleges that a plaintiff's negligence proximately caused his or her injury, UJI 13–306 and the reference to independent intervening cause in UJI 13–305 unduly emphasize a defendant's attempt to shift fault to a plaintiff. *See State ex rel. State Highway Comm'n v. Atchison, Topeka & Santa Fe Ry.*, 76 N.M. 587, 590, 417 P.2d 68, 70 (1966) ("Instructions which are repetitious or which unduly emphasize certain portions of the case should not be given."). We believe that this undue emphasis creates an unacceptable risk that the jury will inadvertently apply the common law rule of contributory negligence

abolished in *Scott.* As a result, we conclude that the jury shall not be instructed on independent intervening cause for a plaintiff's alleged comparative negligence. *Cf. Klopp v. Wackenhut Corp.*, 113 N.M. 153, 157, 824 P.2d 293, 297 (1992) ("If we were to accept that no duty is owed to invitees foreseeably injured only through contributory negligence, we would vitiate the ameliorating effect of comparative fault."). "[L]iability concepts based on or related to negligence of either plaintiff, defendant, or both, are subject to the comparative negligence rule." *Scott*, 96 N.M. at 687, 634 P.2d at 1239. We therefore hold that in New Mexico the doctrine of independent intervening cause does not apply to a plaintiff's negligence. *Cf. Brooks v. Logan*, 127 Idaho 484, 903 P.2d 73, 80–81 (1995) (requiring "an act by a third person or other force in order to establish an intervening, superseding cause" and stating that, for plaintiffs' acts, "we believe the question is more appropriately one of comparative negligence"); *Von der Heide v. Commonwealth Dep't of Transp.*, 553 Pa. 120, 718 A.2d 286, 289 (1998) (stating that an instruction on superseding cause based on a plaintiff's negligence would be "a palpable error of law" because the concept is more "properly considered in determining the degree ... [of] fault under comparative negligence principles").

{19} Similarly, it is the jury's duty under UJI 13–305 and UJI 13–2219 to apportion fault and causation between concurrent tortfeasors other than the plaintiff. Thus, with respect to cases in which independent intervening cause is used to shift fault based solely on disproportionate fault among tortfeasors, we conclude that UJI 13–306 would unduly emphasize the conduct of one tortfeasor over another and would potentially conflict with the jury's duty to apportion fault. At the very least, then, it is clear that the doctrine of independent intervening cause should be carefully applied to avoid conflict with New Mexico's use of several liability. *See L.K.I. Holdings, Inc. v. Tyner*, 658 N.E.2d 111, 119 (Ind.Ct.App.1995) ("The adoption of comparative negligence, with its apportionment of fault, renders the protection of a remote actor unnecessary.").

{20} Unlike cases involving a plaintiff's comparative negligence, however, the application of independent intervening cause to the intervening negligence of third parties does not necessarily always conflict with several liability. *But see Hercules, Inc.*, 765 F.2d at 1075 ("Under a 'proportional fault' system, no justification exists for applying the doctrines of intervening negligence and last clear chance."). There are many cases in which the unforeseeable negligence of a third party can reasonably be said to break the chain of causation such that the defendant's act or omission is not a proximate cause of the plaintiff's injury. *See, e.g., Straley v. Kimberly*, 687 N.E.2d 360, 366 n. 4 (Ind.Ct.App.1997) ("Although we agree with the holding in *Tyner* to the extent that when two negligent actors contribute to a resulting injury, they should both be held responsible we, nevertheless, find that in certain situations, such as the case at bar, the original negligent actor may be so removed from the resulting injury that we, as a society, cannot hold him responsible. As a result, we do not find the holding in *Tyner* applicable to the instant case."), *transfer denied*, 706 N.E.2d 177 (1998). Thus, some of the principles underlying the doctrine of independent intervening cause remain important in our current tort system.

> The virtually unanimous agreement that the liability must be limited to cover only those intervening causes which lie within the scope of the foreseeable risk, or have at least some reasonable connection with it, is based upon a recognition of the fact that the independent causes which may intervene to change the situation created by the defendant are infinite, and that as a practical matter responsibility simply cannot be carried to such lengths.

Keeton et al., *supra*, § 44, at 312.

{21} Nevertheless, our prior cases indicate a trend in New Mexico toward simplifying the complex task of the jury in deciding issues of causation. *See Dunleavy*, 116 N.M. at 359, 862 P.2d at 1218 ("How can we expect the average juror to understand and correctly apply this instruction when it is confusing even to the judiciary of this state?"); *Alexander v. Delgado*, 84 N.M. 717,

719–20, 507 P.2d 778, 780–81 (1973) ("Rules concerning [the elements of negligence and proximate cause] are sufficiently complicated without engrafting upon them the unnecessary concept of unavoidability."). The issue of independent intervening cause adds a complex layer of analysis to the jury's determination of proximate cause. *See, e.g., House v. Kellerman*, 519 S.W.2d 380, 382 (Ky.1975) (making the issue a matter of law and removing it from the jury's consideration because of "the complexity and abstract nature of the various criteria for intervening and superceding causation"). Therefore, consistent with our prior cases discussing the effect of comparative negligence on traditional negligence principles, we believe that the instruction on independent intervening cause is sufficiently repetitive of the instruction on proximate cause and the task of apportioning fault that any potential for jury confusion and misdirection outweighs its usefulness. *Cf. Dunleavy*, 116 N.M. at 359, 862 P.2d at 1218 ("It is not necessary for the judge to charge the jury a second time that the law requires it to consider the circumstances surrounding the actor's conduct in determining whether the actor breached his or her duty to another person."); *Delgado*, 84 N.M. at 719, 507 P.2d at 780 ("Since the ordinary instructions on negligence and proximate cause sufficiently show that the plaintiff must sustain his burden of proof on these issues in order to recover, the instruction on unavoidable accident serves no useful purpose."); *Buckley v. Bell*, 703 P.2d 1089, 1096 (Wyo.1985) (Cardine, J., dissenting) (advocating the abolition of the defense of intervening cause and stating that absolute defenses based on a plaintiff's negligence "merely serve to confuse and make what ought to be simple, extremely difficult, even incomprehensible"). "The defendant is not entitled to have [the] defense [of not proximately causing the injury] overemphasized." *Delgado*, 84 N.M. at 719, 507 P.2d at 780. We believe the instruction on proximate cause will adequately ensure a proper verdict. Therefore, trial courts should not give UJI 13–306, or include a reference to independent intervening cause in UJI 13–305, in cases involving multiple acts of negligence.

{22} Having determined that it was error for the trial court to give UJI 13–306, we must address whether the error requires reversal. *See* Rule 1–061 NMRA 1999 (requiring prejudice to substantial rights of a party in order to constitute reversible error); *cf. Jewell v. Seidenberg*, 82 N.M. 120, 124, 477 P.2d 296, 300 (1970) ("[T]he appellant has the burden of showing that he is prejudiced by an erroneous instruction."). As a general matter, however, we need not address whether the use of UJI 13–306 in pending cases is sufficiently prejudicial to require reversal when the doctrine of independent intervening cause would otherwise be applicable. In the present case, the doctrine of independent intervening cause is not otherwise applicable, and therefore, the instructions on this doctrine constitute reversible error due to "the interjection of a false issue" into the trial. *See Archibeque v. Homrich*, 88 N.M. 527, 531, 543 P.2d 820, 824 (1975).

{23} First, we believe that the doctrine of independent intervening cause does not apply to Torres's negligence due to our determination that the doctrine uniformly does not apply to a plaintiff's negligence. Second, we believe that the doctrine of independent intervening cause is inapplicable with respect to the alleged negligence of Aldershot and its contractors in this case. The instruction on independent intervening cause is to be given if "the evidence presents an issue with regard to an independent intervening cause." UJI 13–306 (directions for use); *see Enriquez v. Cochran*, 1998-NMCA-157, ¶ 71, 126 N.M. 196, 967 P.2d 1136 ("[A] party is entitled to an instruction on his theory of the case if there is evidence to support it."), *cert. denied*, 126 N.M. 532, 972 P.2d 351 (1998). In this case, Torres alleged that EPEC's negligent acts increased the risk of electrocution from contact with its conductors and that his electrocution was a result. Our review of the record reveals that EPEC failed to introduce evidence of any cause that prevented the natural and probable result of its own negligence, thereby producing a different result. *See Thompson*, 59 N.M. at 411–12, 285 P.2d at 514.

[A]ny harm which is in itself foreseeable, as to which the actor has created or in-

creased the recognizable risk, is always "proximate," no matter how it is brought about, except where there is such intentionally tortious or criminal intervention, and it is not within the scope of the risk created by the original negligent conduct. Restatement (Second) of Torts § 442B comment b (1965); *accord Thompson*, 59 N.M. at 412, 285 P.2d at 515.

**{24}** EPEC had a duty to exercise reasonable care in the installation and maintenance of the power pole and conductors in this case and to take reasonable measures to reduce their potential danger. In the first instance, as a part of this duty, "some degree of negligence on the part of all persons is foreseeable...." *Klopp*, 113 N.M. at 157, 824 P.2d at 297; *accord* Keeton et al ., *supra*, § 44, at 304 ("The risk created by the defendant may include the intervention of the foreseeable negligence of others."). Thus, Torres's contact with EPEC's wires, regardless of whether another party's negligence contributed to its occurrence, was within the scope of EPEC's duty. *See* Keeton et al., *supra*, § 44, at 303 ("Obviously, the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which the defendant has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence."). *See generally GCM, Inc. v. Kentucky Cent. Life Ins. Co.*, 1997–NMSC–052, ¶ 23, 124 N.M. 186, 947 P.2d 143 ("[T]he scope of a tort duty is a matter of law."). Here, absent intentional tortious or criminal conduct or extraordinary negligence,[3] none of which EPEC al-

leged, the negligence of others resulting in Torres's electrical contact is not susceptible to the complete defense of independent intervening cause. *See* Keeton et al., *supra*, § 44, at 303 ("One who leaves uninsulated electric wires where people may come in contact with them may anticipate that they will do so as a result of their own acts."); *cf. Osborne v. Russell*, 669 P.2d 550, 557 (Alaska 1983) ("The risk that an intervening force would cause the exposed wires to become deadly is the very risk which rendered [defendant's] failure to insulate negligence."). As alleged by EPEC, the negligence of Aldershot and its contractors was "closely and reasonably associated with the immediate consequences of the defendant's act, and form a normal part of its aftermath; and to that extent [it was] not foreign to the scope of the risk created by the original negligence." Keeton et al., *supra*, § 44, at 307.[4] Thus, the doctrine of independent intervening cause does not apply to the facts of this case.

{25} This case presents a paradigmatic instance of comparative negligence and serves to illustrate why juries should be allowed to resolve the questions involved on the basis of the jury instructions on proximate cause and apportionment of fault. We conclude that the trial court erred in instructing the jury on independent intervening cause and that this instruction interjected a false issue into the trial. Based on the jury's special verdict finding EPEC negligent and negligent per se but not the proximate cause of Torres's injury, we conclude that the trial court's error prejudiced Torres's substantial rights, and we must therefore remand for a new trial.

---

**3.** *Cf. Klopp*, 113 N.M. at 159–60, 824 P.2d at 299–300 (discussing whether a business visitor's negligence "was so extraordinary as to have obviated any duty on the part of the occupier to take precautions against the open and obvious danger"); Restatement (Second) of Torts § 447(c) (stating that a negligent act is not an intervening cause if "the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent"); *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 575 (9th Cir.1995) (stating that a "superseding cause may act to cut off liability for antecedent acts of negligence in admiralty cases where the superseding cause is the result of extraordinary negligence").

**4.** We also note that, even though EPEC alleged an "enormous time difference" between its actions and the actions of Torres, Aldershot, Beukel, and L.E. Electric, Torres alleged that EPEC failed to exercise reasonable care in its ongoing duty to inspect and maintain the power pole. We believe that the doctrine of independent intervening cause would also not apply in this case because these individuals were concurrent tortfeasors. *See* UJI 13–306 committee commentary ("Ordinarily, the concurrent negligence of another person is not an independent intervening cause.").

## III. Directed Verdicts in Favor of EPEC

{26} A directed verdict is a drastic measure that is generally disfavored inasmuch as it may interfere with the jury function and intrude on a litigant's right to a trial by jury. *Melnick v. State Farm Mut. Auto. Ins. Co.*, 106 N.M. 726, 729, 749 P.2d 1105, 1108 (1988). As a result, "[a] directed verdict is appropriate only when there are no true issues of fact to be presented to a jury." *Sunwest Bank, N.A. v. Garrett*, 113 N.M. 112, 115, 823 P.2d 912, 915 (1992). A trial court should not grant a motion for directed verdict unless it is clear that "the facts and inferences are so strongly and overwhelmingly in favor of the moving party that the judge believes that reasonable people could not arrive at a contrary result." *Melnick*, 106 N.M. at 729, 749 P.2d at 1108. In reviewing the propriety of a directed verdict, we "must consider all evidence, insofar as the properly admitted evidence is uncontroverted, and all reasonable inferences deducible therefrom in a light most favorable to the party resisting the motion." *Id.* at 728, 749 P.2d at 1107. In this case, we consider all evidence from Torres's case-in-chief, including evidence adduced by EPEC on cross-examination of Torres's witnesses, and view this evidence in a light most favorable to Torres.

### A. Punitive Damages

{27} In order to demonstrate a basis for punitive damages that is adequate to survive a motion for a directed verdict, a plaintiff in a negligence action must introduce evidence suggesting "a culpable mental state" and conduct "ris[ing] to a willful, wanton, malicious, reckless, oppressive, or fraudulent level." *Clay v. Ferrellgas, Inc.*, 118 N.M. 266, 269, 881 P.2d 11, 14 (1994). Torres does not allege that EPEC willfully caused his injuries. Instead, in his second amended complaint, Torres alleged as a basis for punitive damages that EPEC was grossly negligent and reckless. EPEC claims that this Court, in *Clay*, excluded gross negligence as a basis for punitive damages. We disagree. While it is true that this Court rejected gross negligence as a basis for punitive damages in a contract action in *Paiz v. State Farm Fire & Cas. Co.*, 118 N.M. 203,

211, 880 P.2d 300, 308 (1994), we specifically declined to reach the issue in the context of a negligence action in *Clay*, 118 N.M. at 270 n. 2, 881 P.2d at 15 n. 2. Our present jury instructions omit gross negligence as conduct warranting punitive damages. *See* UJI 13–1827 NMRA 1999 (effective for cases filed on or after July 1, 1998). The jury instruction in effect at the time Torres filed his claim, however, listed grossly negligent conduct as a basis for punitive damages. UJI 13–1827 NMRA 1998 (prior to July 1, 1998 amendment). Because we believe that the concept of recklessness adequately resolves the issue on appeal, the issue of whether the trial court erred in directing a verdict on the claim for punitive damages, we conclude that it is unnecessary to resolve the issue of gross negligence as a basis for punitive damages in negligence claims and once again decline to reach it.

{28} Recklessness in the context of punitive damages refers to "the intentional doing of an act with utter indifference to the consequences." UJI 13–1827 NMRA 1999. The degree of the risk of danger involved in the activity in question is a relevant factor in determining whether particular conduct rises to the level of recklessness.

[A]s the risk of danger increases, conduct that amounts to a breach of duty is more likely to demonstrate a culpable mental state. The circumstances define the conduct; a cavalier attitude toward the lawful management of a dangerous product may raise the wrongdoer's level of conduct to recklessness, whereas a cavalier attitude toward the lawful management of a non-dangerous product may be mere negligence.

*Clay*, 118 N.M. at 269, 881 P.2d at 14.

{29} "[W]hether work is inherently dangerous is a question of law...." *Saiz v. Belen Sch. Dist.*, 113 N.M. 387, 395–96, 827 P.2d 102, 110–11 (1992). In this case, the power conductor, if negligently installed or maintained, presented a serious risk of injury due to its inherent dangerousness. *Id.* at 398, 827 P.2d at 113 ("It would seem beyond dispute that electricity has certain well-known inherent dangers. It gives no warning of its presence, and if amperage and

voltage are sufficiently high its discovery can be attended by fatal consequences."); *cf. Gonzales v. Surgidev Corp.*, 120 N.M. 133, 147, 899 P.2d 576, 590 (1995) (concluding that an experimental intraocular lens implant, due to "potentially disastrous consequences in the event of product failure," constituted an inherently dangerous product for which a "broader range of improper conduct" might demonstrate a culpable mental state for purposes of awarding punitive damages). "It is reasonably necessary to reduce the hazard associated with a high-voltage supply line by placing bare electrical conductors where they remain inaccessible, or by insulating them adequately, or both." *Saiz*, 113 N.M. at 398, 827 P.2d at 113. Because the design, installation, and maintenance of the power pole and conductors in this case presented a peculiar risk or special danger in the absence of reasonable precautions, we conclude that this case involves an inherently dangerous activity.[5] *Cf. Schultz v. Consumers Power Co.*, 443 Mich. 445, 506 N.W.2d 175, 178 (1993) ("[I]t is well settled that electricity possesses inherently dangerous properties requiring expertise in dealing with its phenomena."); *Cantu v. Utility Dynamics Corp.*, 70 Ill. App.3d 260, 26 Ill.Dec. 160, 387 N.E.2d 990, 993 (1979) ("The distribution of electrical energy is an inherently dangerous enterprise and power companies and those installing such lines are required to exercise a high degree of care to see that their wires are properly placed and insulated."), *cited with approval in Saiz*, 113 N.M. at 398, 827 P.2d at 112.

{30} We must determine, then, whether Torres introduced evidence of EPEC's conduct that, when viewed in a light most favorable to Torres, could give rise to an inference by a reasonable jury that EPEC had a cavalier attitude toward the lawful management of its dangerous activity. In assessing the culpability of a corporate entity such as EPEC, we look to the "cumulative effects" of the actions of its employees.

*Clay*, 118 N.M. at 270, 881 P.2d at 15. Finally, in determining the adequacy of evidence introduced by Torres concerning EPEC's culpable mental state, we bear in mind that punitive damages serve the limited purposes of "punish[ing] a wrongdoer," *id.* at 269, 881 P.2d at 14, and deterring future tortious conduct, *see Paiz*, 118 N.M. at 210, 880 P.2d at 307.

{31} In this case, Torres introduced evidence that EPEC was negligent in several respects in designing and installing the power pole in 1981. Jerry Williams, whom the trial court qualified as an expert structural engineer, testified on behalf of Torres that the design and installation of the pole did not conform to "good, accepted engineering practice" in a number of ways. First, the pole was bent and failed to meet accepted standards of sweep, or straightness. Second, the pole, even if it had been straight, was overloaded by supporting three transformers under conditions which should have indicated to EPEC, under EPEC's own distribution standards overhead (DSO) and according to good engineering practice, the use of no transformers on the pole. With respect to the company's DSO's, a current EPEC employee testified that it is important to comply with the DSO's in the installation of power poles. Mr. Williams concluded that the combination of the bent pole and the overloading predisposed the pole "to lean even further" and caused the pole to buckle and go into structural failure. Further, the pole was placed in wet sand and with two steep guy wires that "were not considered in the installation of this pole." Third, the wires were not properly tensioned at the time of installation. Mr. Williams also testified that EPEC has no structural engineers on staff.

{32} Andrew LeCoq, whom the trial court qualified as an expert in the field of human factors, also testified that EPEC used a "very dangerous design" due to the closeness of the wire to the building and the bent pole, as well as the resulting effect of the

---

5. The dissent's reference to strict liability is misplaced. The discussion of strict liability in *Saiz* was clearly limited to the nondelegable duty context. *See Saiz*, 113 N.M. at 397, 827 P.2d at 112 (distinguishing inherently dangerous activities in the context of a nondelegable duty from ultrahaz-ardous, or abnormally dangerous, activity for which liability will be imposed "even though all reasonable precautions have been taken against the risk of harm the activity creates"). By applying *Saiz*, we do not incorporate concepts of strict liability into this case.

lines "coming subtly, and deceptively closer" to the greenhouse. James Tester, an electrical engineer and former employee of EPEC, testified that EPEC's design did not meet standards of good engineering practice due to the closeness of the pole to the building and the number of large transformers designed to go on the pole. In addition, he testified that the installation did not meet standards of good engineering practice in that EPEC used a bent pole, placed too much weight on it, and leaned it toward the greenhouse. Further, he testified on cross-examination that EPEC had previously designed similar-sized poles, Class II, with a similar amount of weight and that the earlier designs also failed to meet standards of good engineering practice. Finally, the engineering technician who designed the pole at issue in this case testified that he did not know that the installation crew would choose a bent pole and, if he had known, it would have affected his design. He also testified that EPEC did not check the type of soil at the site before he made his design.

{33} In addition to Torres's evidence of numerous problems with the design and installation of the pole, Torres also introduced evidence that EPEC was negligent in the maintenance of the pole. An EPEC safety specialist testified that EPEC has a policy of keeping high power conductors away from roofs and buildings "for people's safety." Nonetheless, several witnesses testified that the pole installed in 1981 had shifted over four feet towards the greenhouse, which resulted in the wire that Torres contacted being almost directly over the roof of the greenhouse. In addition, Mr. Williams testified that the bend in the pole, as well as the shifting, caused the wire to sag, and Mr. Tester testified that the height of the wire over the roof was approximately seven feet lower than the minimum clearance provided under the relevant code. Mr. Tester also testified that a utility such as EPEC is responsible under the code for discovering any problems in its system, and he testified that, although EPEC had a patrol program, EPEC's failure to have a formal patrol and inspection program with written documentation prevented EPEC management from identifying trends that would indicate the need for more rigorous inspection of particular problems. Finally, two witnesses, Lynn Eichelberger, the owner of L.E. Electric, and Robert Evans, an employee of L.E. Electric and a former lineman for EPEC, testified that they each twice notified EPEC about the continued worsening of the condition of the pole, which had large vertical cracks and hairline horizontal cracks, and the proximity of the wire to the greenhouse prior to the accident. Mr. Eichelberger and Mr. Evans both testified that EPEC failed to respond to their first complaints. Although these witnesses also testified that EPEC sent a crew out to inspect the pole after the second complaints, Mr. Evans testified that the EPEC employee in charge of the crew, Margarito Lucero, concluded that the pole and wires were within clearance standards based on "some, not real accurate measurements" used by Lucero and that EPEC took no further action even though its employees were told that Aldershot employees were sometimes required to work on the roof of the greenhouse.

{34} In granting the motion for directed verdict on the claim of punitive damages, the trial judge stated,

[A]t first blush I think, yes, El Paso Electric may have ignored warnings, may have blown this thing off so to speak, but reviewing the evidence in my own mind, I don't believe that's the case either. They had the warnings and they did what I think the natural thing to do is, send somebody out there to inspect it and see if we have a genuine problem or somebody just whining, maybe. A person was sent out and a qualified person, apparently, from the evidence, made the determination that maybe the pole was ugly but it was serving the purpose, and perhaps that person made a mistake. In that case I think then it is probably—it will be brought out in the negligence portion of the case.

We do not disagree with the trial court that much of the evidence introduced by Torres could be reasonably interpreted in favor of EPEC as showing that the company was not reckless with regard to the safety of others. For example, Mr. Evans and Mr. Eichelberger testified that Margarito Lucero, the

EPEC employee who inspected the pole, is an excellent lineman and is meticulous about quality. In addition, EPEC established on cross-examination of Mr. Tester that, if Mr. Tester was wrong in his interpretation of the code, then the conductor would not have been below the minimum height requirement over the greenhouse roof. EPEC also established on cross-examination that the company had a patrol and inspection program at the time of the accident, though not a formal program, and that EPEC does "quite a good job" of correcting problems. Finally, EPEC established that Mr. Tester had, while working for EPEC, once approved a design of a similar-sized pole with equivalent weight, thereby tending to discredit Mr. Tester's position that the weight designed for the pole at issue in this case failed to comply with standards of good engineering practice. Finally, several witnesses, including Mr. Eichelberger and an EPEC safety specialist, testified that EPEC does a good job in the Las Cruces community and that safety is a top priority for the company. This evidence tends to support EPEC's position that it was not reckless about the safety of others with respect to potential contact with its electrical equipment.

{35} Nevertheless, at the directed verdict stage, we view the evidence in a light most favorable to Torres and leave to the jury the task of resolving conflicting inferences arising from that evidence. *See Melnick*, 106 N.M. at 728, 749 P.2d at 1107 ("[I]f reasonable minds can differ on the conclusion to be reached under the evidence or the permissible inferences to be drawn therefrom, the question is one for the jury and it is error to direct a verdict."). While the trial court's ruling focused solely on EPEC's response to complaints about the pole, the evidence introduced by Torres gives rise to a possible inference that EPEC was negligent in its design of the pole, in its installation of the pole, and in its continued maintenance of the pole. Viewed cumulatively, we conclude that a reasonable jury could find that EPEC's series of actions with regard to this power pole, from the time of design to the time of the accident, indicated recklessness with regard to the safety of others.

{36} Although the dissent portrays otherwise, we emphasize that our holding in this case is a narrow one in which we apply existing precedent in New Mexico. While it is true that the *facts* of *Clay, Gonzales,* and *Saiz* are distinguishable from the present matter, as all cases necessarily differ somewhat in their facts, the legal analysis in each of those cases is clearly on point. In *Clay*, we relied heavily on *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 388–90 (Ky.1985) to explain our decision to view the acts of corporate employees cumulatively for purposes of punitive damages. *Clay*, 118 N.M. at 270–71, 881 P.2d at 15–16. Similar to our explanation in *Clay* concerning the dissent in *Horton*, we believe that the dissent in this case misses the focus of our conclusions. "Here liability for punitive damages is not based on a single, isolated unauthorized and unexpected act of negligence by an employee." *Horton*, 690 S.W.2d at 390, *quoted in Clay*, 118 N.M. at 271, 881 P.2d at 16. Resolving all reasonable inferences in favor of Torres, as we must do when reviewing a directed verdict, EPEC employees in this case engaged in a course of conduct during which a number of national safety requirements and internal policies were not followed. In addition, EPEC did not have adequate patrol and maintenance policies and did not employ the proper individuals, structural engineers, to ensure that its designs would conform to good engineering practice. Further, it appears that EPEC did not have a policy for obtaining soil samples for use in design or a requirement that an installation crew communicate its choice of a bent pole to the designing technician to determine whether alterations to the design would be necessary. Finally, the evidence permits a reasonable inference that EPEC disregarded at least two warnings about the pole and responded in a cursory manner to repeated warnings by the same individuals. In light of these permissible reasonable inferences, we are unable to conclude that the facts are so strongly and overwhelmingly in favor of EPEC to justify removing the issue of punitive damages from the jury. *Cf. Cerretti v. Flint Hills Rural Elec. Coop. Ass'n*, 251 Kan. 347, 837 P.2d 330, 344–46 (1992) (holding that a power company's negligent failure to main-

tain its power lines adequately supported a jury's finding of wanton misconduct by clear and convincing evidence for purposes of upholding a punitive damages award). Our holding goes no further; in other words, we do not hold that Torres is entitled to punitive damages, which is a matter that can only be decided by the jury, and, contrary to the dissent's leap of logic, our holding does not "expand[ ] the potential liabilities of *all* companies doing business in New Mexico." EPEC is engaged in the business of distributing high voltage electricity, which is an inherently dangerous activity. It is the public policy of this State to deter " 'corporate indifference' in the face of serious risks of danger that should reasonably be foreseen." *Clay*, 118 N.M. at 271, 881 P.2d at 16. Thus, allowing punitive damages to go to the jury in this case furthers the policy of deterrence underlying punitive damage awards by ensuring that corporations exercise greater control over their employees in relation to the management of an inherently dangerous activity. Therefore, we reverse the district court's directed verdict on Torres's claim for punitive damages.[6]

## B. Intentional Spoliation of Evidence

{37} This Court has previously recognized the tort of intentional spoliation of evidence. *Coleman v. Eddy Potash, Inc.*, 120 N.M. 645, 649, 905 P.2d 185, 189 (1995). In *Coleman*, we established the following elements for the tort of intentional spoliation of evidence:

> (1) the existence of a potential lawsuit; (2) the defendant's knowledge of the potential lawsuit; (3) the destruction, mutilation, or significant alteration of potential evidence; (4) intent on the part of the defendant to disrupt or defeat the lawsuit; (5) a causal relationship between the act of spoliation and the inability to prove the lawsuit; and (6) damages.

*Id.* However, we noted in *Coleman* that the treatment of this tort in other jurisdictions had not yielded "much agreement . . . on its contours and limitations." *Id.* at 648, 905

P.2d at 188. This case requires us to more closely examine the scope of this tort and the meaning of certain elements we set out in *Coleman*.

{38} Torres alleged that EPEC discarded the power pole with the intent of disrupting his potential lawsuit. Torres introduced evidence that EPEC was notified about Torres's contact with the wire shortly after the accident and that EPEC employees went to the scene of the accident and took measurements from the point of contact on the power line to the pole, the building, and the ground. In addition, EPEC's claims department undertook an approximately two-week investigation beginning the day of the accident. A claims representative from EPEC testified that she noticed that the pole was leaning and that the wire appeared to be going over the top of the building. Approximately one month after the accident, an EPEC construction supervisor cut the pole into pieces because, in his opinion, the space between the pole and building was too narrow to safely maneuver his line truck to remove the pole intact. After cutting down the pole, the construction supervisor removed the pieces to EPEC's yard on Compress Road, and he testified that he did not know what happened to the pieces after that. Richard Swartz, manager of operations for EPEC's New Mexico division, testified that he spoke to the claims department and to counsel before deciding to cut down the pole. He also testified that the pieces of the pole were probably taken to the scrap pole rack and either given to charity or sold. He further testified that he was not aware of a need to save the pieces because he believed that the claims department had all necessary measurements and pictures. Mr. Williams, Torres's structural engineering expert, testified that the pole could have been used to determine the stress within the pole, the height of the pole above the ground, the amount of bend in the pole, and the exact location of the conductor. Mr. Williams also testified that EPEC's measurement of the height of the conductor off the ground was "critical" to his expert opinion.

---

**6.** Our reversal of the jury verdict and judgment in favor of EPEC on the negligence claim make it unnecessary to reach EPEC's argument that the jury verdict rendered harmless any error in directing a verdict on the claim of punitive damages.

{39} The trial court, stating that "[g]enerally, spoliation of evidence results after a complaint has been filed," found that there was not "evidence of the knowledge that there's going to be a lawsuit" because, although EPEC "probably surmised there might be, ... mere surmise is [not] enough to rise to the level of knowing that there is a litigation." In addition, the trial court stated, "Once the pole is cut down, I don't think it can ever be put back so that it would be a credible piece of evidence." We disagree with both of these rationales of the trial court. However, because we agree with the trial court that there was insufficient evidence of an intent to disrupt or defeat Torres's lawsuit, we affirm the directed verdict in favor of EPEC on the claim of intentional spoliation of evidence.

{40} In *Coleman*, we followed California, Alaska, and Ohio in recognizing the tort of intentional spoliation of evidence. 120 N.M. at 648, 905 P.2d at 188. We noted, however, that a majority of jurisdictions had rejected a separate cause of action for intentional spoliation of evidence and had chosen, instead, to rely exclusively on traditional remedies, such as sanctions for discovery violations or an instruction to the jury that spoliation gives rise to a permissible inference that the evidence would have been unfavorable to the spoliator. *Coleman*, 120 N.M. at 649, 905 P.2d at 189. Since our decision in *Coleman*, the high courts of other states, including California, the state in which a separate cause of action for spoliation found its genesis, *see Smith v. Superior Court*, 151 Cal. App.3d 491, 198 Cal.Rptr. 829, 833 (1984), have now joined the majority of jurisdictions in relying solely on traditional remedies rather than recognizing a separate tort. *See Cedars–Sinai Med. Ctr. v. Superior Court*, 18 Cal.4th 1, 74 Cal.Rptr.2d 248, 954 P.2d 511, 514–21 (1998); *Monsanto Co. v. Reed*, 950 S.W.2d 811, 815 (Ky.1997); *Trevino v. Ortega*, 969 S.W.2d 950, 951–53 (Tex.1998); *see also Temple Community Hosp. v. Superior Court*, 20 Cal.4th 464, 84 Cal.Rptr.2d 852, 976 P.2d 223, 225 (1999) (extending the holding of *Cedars–Sinai Medical Center* to spoliation committed by a nonparty); *Lucas v. Christiana Skating Ctr., Ltd.*, 722 A.2d 1247, 1248–51 (Del.Super.Ct.1998); *cf. Lari-*

*son v. City of Trenton*, 180 F.R.D. 261, 266 (D.N.J.1998) ("This court is not convinced that the New Jersey Supreme Court would adopt intentional spoliation of evidence as an affirmative cause of action....."). *But see Holmes v. Amerex Rent–A–Car*, 710 A.2d 846, 848–49 (D.C.1998) (adopting a separate cause of action for reckless or negligent spoliation of evidence); *but cf. Foster v. Lawrence Mem'l Hosp.*, 809 F.Supp. 831, 838 (D.Kan.1992) (concluding that the Supreme Court of Kansas would recognize the tort of spoliation under some circumstances despite the court's rejection of the claim in *Koplin v. Rosel Well Perforators, Inc.*, 241 Kan. 206, 734 P.2d 1177 (1987)).

{41} Courts have articulated a number of reasons for rejecting a separate cause of action for spoliation of evidence. First, courts have expressed concern about "the unwarranted intrusion on the property rights of a person who lawfully disposes of his [or her] own property." *Koplin*, 734 P.2d at 1183. Second, courts have relied on the adequacy of alternative remedies. *See Cedars–Sinai Med. Ctr.*, 74 Cal.Rptr.2d 248, 954 P.2d at 517–18 (discussing, among other things, the evidentiary inference applicable to spoliation and potential discovery sanctions); *Trevino*, 969 S.W.2d at 952–53 (similar). Third, courts have characterized the harm or damages in such cases as speculative. *See Cedars–Sinai Med. Ctr.*, 74 Cal.Rptr.2d 248, 954 P.2d at 518–19 (harm); *Koplin*, 734 P.2d at 1183 (damages); *Trevino*, 969 S.W.2d at 952–53 (damages). Fourth, courts have drawn an analogy to other litigation-related wrongs, such as perjury, for which there is no independent cause of action. *See, e.g., Cedars–Sinai Med. Ctr.*, 74 Cal.Rptr.2d 248, 954 P.2d at 515–16. Finally, courts have relied on potential procedural complications, such as jury confusion, duplicative litigation, or arbitrarily inconsistent results. *Id.* 74 Cal.Rptr.2d 248, 954 P.2d at 519–20.

{42} We concluded in *Coleman* that these considerations, while important, are outweighed by the strong public policy in New Mexico disfavoring unjustifiable, intentional wrongs that cause harm to others. 120 N.M. at 649, 905 P.2d at 189 (relying on this Court's recognition of prima facie tort in

*Schmitz v. Smentowski,* 109 N.M. 386, 393–96, 785 P.2d 726, 733–36 (1990)). However, we relied on many of these reasons in rejecting a separate cause of action for *negligent* spoliation of evidence. *Coleman,* 120 N.M. at 650, 905 P.2d at 190 (stating that "adequate remedies exist" under "traditional negligence principles" and relying on "the general expectation that an owner has a free hand in the manner in which he or she disposes of his or her property"); *see also Meyn v. State,* 594 N.W.2d 31, 34 (Iowa 1999) (declining to adopt a cause of action for negligent spoliation of evidence). We do not retreat from our commitment in *Coleman* and *Schmitz* to deter malicious acts and to redress harm resulting therefrom. Nevertheless, we now rely on the above principles, balanced against the purpose of the tort in preventing intentional harms, to guide our interpretation of the elements of the tort of intentional spoliation of evidence.

{43} In this case, the trial court relied on the element of knowledge of a potential lawsuit in granting EPEC's motion for directed verdict. Torres presented circumstantial evidence of knowledge of a potential claim. EPEC was notified of Torres's contact with the conductor, and EPEC employees went to the scene of the accident shortly after it occurred. EPEC's employees took measurements at the scene, including the distance between the conductor and the pole, the ground, and, allegedly, the building, and EPEC's claims department, which has as one of its purposes the investigation of potential claims against EPEC, investigated the accident. The claims department was aware that Torres had suffered serious injuries as a result of his contact with the wire. Finally, one of EPEC's employees commented that the power pole was leaning badly and needed to be removed, and a claims representative noticed the lean in the pole and the location of the wire over the roof of the greenhouse, the latter of which would have been a violation of EPEC's internal policies.

{44} Although determining from this evidence that EPEC may have surmised that there would be a lawsuit, the trial court concluded that mere surmise was insufficient to meet the element of knowledge articulated in *Coleman.* We disagree. We do not require the filing of a complaint or even express notice that a complaint is to be filed in order to trigger liability for intentional spoliation of evidence. As indicated by our language in *Coleman,* the relevant inquiry is knowledge on the part of the defendant of a probability of a lawsuit in the future. *Coleman,* 120 N.M. at 649, 905 P.2d at 189 (establishing as an element knowledge of a lawsuit or a "potential lawsuit"); *see also Smith v. Howard Johnson Co.,* 67 Ohio St.3d 28, 615 N.E.2d 1037, 1038 (1993) (requiring "knowledge . . . that litigation exists *or is probable*" (emphasis added)). Contrary to the suggestion by other jurisdictions that alternative remedies suffice to punish intentional spoliation, our primary goal in adopting a separate cause of action for intentional spoliation was not to vindicate the interests of the courts in preventing litigation-related fraud, an evil that we agree is adequately addressed by other remedies. *Cf. Gonzales v. Surgidev Corp.,* 120 N.M. 151, 154–55, 899 P.2d 594, 597–98 (1995) (stating that "[a]n award of [discovery] sanctions is based on a party's misconduct towards the court," that the purpose of sanctions is both to vindicate judicial authority by achieving discovery and deterring future misconduct and to compensate a party for expenses resulting from discovery abuse, and that a court has inherent authority to vacate a judgment based on extrinsic or collateral fraud on the court). Instead, we adopted the tort in order to protect litigants' and potential litigants' prospective right of recovery in civil actions from malicious interference. *See Coleman,* 120 N.M. at 649, 905 P.2d at 189. Thus, we conclude that, to adequately protect such an interest, the tort of intentional spoliation of evidence must target wrongful activity occurring prior to the filing of a complaint. Based on the condition of the pole, the location of the wire, EPEC's awareness of the circumstances and effects of Torres's accident, and EPEC's investigation into the incident, we conclude that the evidence introduced by Torres was sufficient for a reasonable jury to infer that EPEC knew there was a reasonable likelihood that litigation would result from Torres's contact with its conductor. At the directed verdict stage of proceedings, more is not required.

{45} Additionally, the trial court concluded that Torres failed to introduce evidence of a causal relationship between EPEC's discarding of the pole and any inability to prove EPEC's negligence. Specifically, the trial court concluded that, having been cut down in pieces, the pole could not be used to produce accurate measurements. Based on the record, we disagree. Two EPEC employees testified that, if the pole had been saved in pieces, the pieces could be lined up and measured. It does not appear from the record that any witness contradicted this testimony. In addition, two of Torres's expert witnesses testified that the height of the wire, which would have provided a measurement from the point of contact to the building and to the ground, was critical to a determination of the propriety of EPEC's actions. Mr. Tester testified that EPEC failed to provide measurements from the point of contact to the building even though it would have been good engineering practice to have made such a measurement in investigating this type of accident. Finally, it appears that EPEC's determination of the point of contact on the rod conflicted with Mr. Tester's, and EPEC's measurement would have had the effect of making the wire appear to be further away from the building. Thus, the distance between the building and the wire was a fact of consequence disputed by the parties, and Torres established that the distance could have been determined if EPEC had preserved the pole. *See Melnick,* 106 N.M. at 729, 749 P.2d at 1108 ("To remove a case from the jury, it should be clear that the nonmoving party has presented no true issues of fact which that party has the right to have decided by his [or her] peers.").

{46} We note that at the directed verdict stage it will be difficult for plaintiffs pursuing an action for spoliation simultaneously with their underlying claim to establish the elements of causation and damages. Without a jury verdict, a plaintiff will not know, or be able to prove, at the directed verdict stage whether he or she has successfully been able to prove the elements of the underlying claim despite the absence of the evidence alleged to have been destroyed, altered, or mutilated. Nevertheless, we believe that spoliation, at least spoliation that is discovered prior to trial, should be tried in conjunction with the underlying claim rather than in a bifurcated or separate trial. "A single trier of fact would be in the best position to resolve all the claims fairly and consistently. If a plaintiff loses the underlying suit, only the trier of fact who heard the case would know the real reason why." *Boyd v. Travelers Ins. Co.,* 166 Ill.2d 188, 209 Ill.Dec. 727, 652 N.E.2d 267, 272 (1995) (declining to recognize a separate cause of action for negligent spoliation of evidence but allowing such a claim to proceed as an action in negligence); *accord Smith,* 615 N.E.2d at 1038 (stating that a claim of intentional spoliation of evidence "may be brought at the same time as the primary action"); *Cedars–Sinai Med. Ctr.,* 74 Cal.Rptr.2d 248, 954 P.2d at 520 (stating that separate actions would result in a "duplication of effort [that] would be burdensome both to the parties and to the judicial system" and would create a higher risk of inconsistent proceedings). At the directed verdict stage of a concurrent proceeding for intentional spoliation and the underlying claim, a plaintiff need only present evidence from which a reasonable jury, upon finding in favor of the defendant on the underlying claim, could conclude that the intentional spoliation of evidence caused the plaintiff's failure to satisfy the burden of proof in the underlying claim. Torres satisfied this burden.

{47} Therefore, we conclude that Torres adequately proved five of the *Coleman* elements for purposes of surviving a motion for directed verdict: the existence of a potential lawsuit; EPEC's knowledge of the potential lawsuit; the destruction of potential evidence; a causal relationship between the act of spoliation and the inability to prove the lawsuit; and damages. However, we affirm the directed verdict in favor of EPEC because we conclude that Torres failed to demonstrate that EPEC, in discarding the pole, had an intent to disrupt or defeat the lawsuit. Torres thus failed to satisfy the fourth element articulated in *Coleman.*

{48} It is clear from our reliance on prima facie tort in *Coleman* that the

element of an intent to disrupt or defeat a lawsuit refers not to a mere intentional act but to a level of culpability that is particularly egregious in civil actions: a malicious intent to harm. *See Coleman,* 120 N.M. at 649, 905 P.2d at 189 (adopting intentional spoliation of evidence tort "[i]n concurrence with" New Mexico's tradition of affording " 'relief for wrongs intentionally and maliciously committed' " (quoting *Schmitz,* 109 N.M. at 396, 785 P.2d at 736))); *see also Lexington Ins. Co. v. Rummel,* 1997–NMSC–043, ¶¶ 10, 14, 123 N.M. 774, 945 P.2d 992 ("The terms malice and intent to injure have been used synonymously within our jurisprudence on prima facie tort," and "[i]ntent to injure is distinct from intent to commit the act which results in injury."); *cf. Drawl v. Cornicelli,* 124 Ohio App.3d 562, 706 N.E.2d 849, 852 (1997) ("To establish her spoliation claim, appellant was required to demonstrate that appellee willfully destroyed, altered, or concealed evidence."). "Malice in turn is the intentional doing of a wrongful act without just cause or excuse. This means that the defendant not only intended to do the act which is ascertained to be wrongful, but that he knew it was wrong when he did it." *Kitchell v. Public Serv. Co.,* 1998–NMSC–051, ¶ 17, 126 N.M. 525, 972 P.2d 344 (internal quotation marks and citations omitted); *accord Drawl,* 706 N.E.2d at 852 (defining willful for purposes of intentional spoliation as an act " 'done voluntarily and intentionally and with the specific intent to do something the law forbids ...; that is to say, with bad purpose' " (quoting Black's Law Dictionary 1599 (6th ed.1990)). Additionally, "[p]laintiffs bear a heavy burden to establish intent to injure." *Lexington Ins. Co.,* 1997–NMSC–043, ¶ 12, 123 N.M. 774, 945 P.2d 992.

{49} What is not clear from our discussion in *Coleman,* however, is whether a party's malicious intent to disrupt or defeat another's lawsuit must be the sole motivation for the destruction, alteration, or mutilation of evidence. In *Schmitz,* we rejected the contention that there be a "sole motivation of harm" for prima facie tort. 109 N.M. at 397, 785 P.2d at 737. In doing so, we distinguished the Court of Appeals' opinion dealing with the tort of intentional interference with prospective contractual relations in *M & M Rental Tools, Inc. v. Milchem, Inc.,* 94 N.M. 449, 454, 612 P.2d 241, 246 (Ct.App.1980), based on the fact that "[t]he rights implicated by a prima facie tort are not prospective." *Schmitz,* 109 N.M. at 397, 785 P.2d at 737. Additionally, we rejected the requirement of " 'disinterested malevolence' " because we adopted the Restatement (Second) of Torts approach of balancing alternative motives with the intent to injure in order to determine whether a defendant's actions could be characterized as justifiable. *Schmitz,* 109 N.M. at 395, 785 P.2d at 735.

{50} Unlike prima facie tort, the tort of intentional spoliation of evidence seeks to remedy the "probable expectancy" of "a prospective civil action," and the tort has been "analogized ... to the tort of intentional interference with prospective business advantage." *See Coleman,* 120 N.M. at 648, 905 P.2d at 188 (describing the analysis in *Smith v. Superior Court,* 198 Cal.Rptr. at 836–37). Although we specifically eschewed any form of balancing of the intent to disrupt a lawsuit with other motives in *Coleman* because intentional spoliation "is highly improper and cannot be justified," 120 N.M. at 649, 905 P.2d at 189, we believe that the tort of intentional spoliation of evidence must be carefully framed to avoid undue interference with property rights. *Cf. Coleman,* 120 N.M. at 650, 905 P.2d at 190 ("[I]t would be unreasonable to impose a duty on an owner to preserve his personal property for the use of another individual in a potential lawsuit in the absence of special circumstances."); *Drawl,* 706 N.E.2d at 852 (stating that intentional spoliation must require a willful act "because if the cause of action merely required a showing that the defendant intentionally altered evidence, the process of updating documentary evidence in the normal course of business would be halted pending the outcome of a case"). As a result, based on the differences between the torts of intentional spoliation of evidence and prima facie tort, and the similarities between the former and the tort of intentional interference with prospective business relations, we believe that the tort recognized in *Coleman* seeks to remedy acts taken with the sole intent to maliciously defeat or disrupt a lawsuit.

{51} We view the facts of this case with these principles in mind. The evidence introduced by Torres relating to EPEC's state of mind in removing and disposing of the power pole included the following: (1) Lynn Eichelberger testified that a line truck could have fit between the building and the pole in order to remove the pole intact; (2) EPEC had a policy to preserve evidence in cases resulting in serious injury and, in fact, saved the transformers on the pole; (3) an EPEC claims representative could provide no explanation for the failure to save the pieces of the pole; (4) EPEC failed to provide measurements of the distance from the conductor at the point of contact to the building, even though an EPEC employee remembered such a measurement being taken; and (5) an EPEC employee changed the measurement of the point of contact on the rod that Torres was holding at the time of the accident. However, EPEC elicited testimony on cross-examination of several witnesses that put Torres's allegations in context. With respect to the removal of the pole, Mr. Eichelberger's testimony that it was possible to remove the pole intact did not contradict the testimony of EPEC's employee, Michael Boone, that he could not do so safely or without risking damage to the nearby buildings. In addition, Mr. Boone testified that his decision to cut down the pole in pieces was based only on safety concerns and that he did not consider the possibility of a lawsuit. Further, although EPEC had a policy to preserve evidence, Mr. Swartz, EPEC's manager of operations, testified that after conferring with the claims department and with counsel he determined that the pole pieces were unnecessary because he believed that the claims department had taken all necessary measurements and photographs before the pole had been removed. An EPEC claims representative testified that EPEC does not typically save evidence if it is not thought to be relevant, and EPEC typically sells or donates pole pieces that are no longer usable. Finally, although EPEC changed measurements on the rod, it does not appear that EPEC attempted to conceal its original measurement, and an EPEC employee testified that the change resulted from a difference of opinion between EPEC employees.

{52} Even viewed in a light most favorable to Torres, we believe that this evidence is insufficient to demonstrate a malicious intent on the part of EPEC to defeat or disrupt Torres's lawsuit at the time that EPEC disposed of the pole. *Cf. Drawl,* 706 N.E.2d at 852–53 (stating that the tort of intentional spoliation of evidence "necessarily requires more than mere negligence or failure to conform to standards of practice" and affirming summary judgment in favor of a defendant based on the absence of willful spoliation); *Kitchell,* 1998–NMSC–051, ¶¶ 16–18, 126 N.M. 525, 972 P.2d 344, (affirming summary judgment on claim of prima facie tort due to the absence of an actual intent to injure); *Rummel,* 1997–NMSC–043, ¶ 16, 123 N.M. 774, 945 P.2d 992 (similar). We conclude that the trial court properly granted EPEC's motion for directed verdict on the claim of intentional spoliation of evidence.

{53} Where the actions of the spoliator fail to rise to the level of malicious conduct or otherwise meet the elements of the tort of intentional spoliation of evidence, we believe a more appropriate remedy would be a permissible adverse evidentiary inference by the jury in the underlying claim. This evidentiary inference could be accomplished through an instruction to the jury that it is permissible to infer that evidence intentionally destroyed, concealed, mutilated, or altered by a party without reasonable explanation would have been unfavorable to that party. Trial courts, in determining whether to give this instruction, should consider whether the spoliation was intentional, whether the spoliator knew of the reasonable possibility of a lawsuit involving the spoliated object, whether the party requesting the instruction "acted with due diligence with respect to the spoliated evidence," and whether the evidence would have been relevant to a material issue in the case. *See Beers v. Bayliner Marine Corp.,* 236 Conn. 769, 675 A.2d 829, 832–33 (1996). It is not necessary that the spoliator act with malice or bad faith. *See Beers,* 675 A.2d at 833 ("By [the requirement of intentional spoliation], we do not mean that there must have been an intent to perpetrate a fraud by the party ... but, rather, that the evidence had been dis-

posed of intentionally and not merely destroyed inadvertently." (footnote omitted)); *Miller v. Montgomery County,* 64 Md.App. 202, 494 A.2d 761, 768 (1985) ("Unexplained and intentional destruction of evidence by a litigant gives rise to an inference that the evidence would have been unfavorable to his [or her] cause, but it would not in itself amount to substantive proof of a fact essential to his [or her] opponent's cause."); *State ex rel. Comm'r of Transp. v. Council in the Div. of Resource Dev.,* 60 N.J. 199, 287 A.2d 713, 715 (1972) (stating that a permissible adverse inference applies if there is "[a] conscious awareness of the existence of a dispute with another and a conscious awareness that an act done will destroy evidence or access to evidence").

{54} We believe that a jury instruction of this nature would be appropriate in some cases not strictly meeting the elements of the tort of intentional spoliation of evidence because it is reasonable to presume that, even though parties do not have an affirmative duty to preserve evidence for another's benefit absent special circumstances, *Coleman,* 120 N.M. at 650, 905 P.2d at 190, parties will nonetheless avoid intentionally discarding evidence that would have been favorable to them. *See Miller,* 494 A.2d at 768 ("[O]ne would ordinarily not destroy evidence favorable to himself [or herself]."); *Garrett v. Terminal R. Ass'n,* 259 S.W.2d 807, 812 (Mo. 1953) ("It is well settled that the destruction of written evidence without a satisfactory explanation gives rise to an inference unfavorable to the spoliator."); *Williams v. Golden,* 699 So.2d 102, 108 (La.Ct.App.1997) ("It is well settled that when a litigant fails to produce available evidence and no reasonable explanation is made, there is a presumption that such evidence would be unfavorable."), *writ denied,* 709 So.2d 708 (1998). *See generally* 2 John Henry Wigmore, *Evidence in Trials at Common Law* §§ 285, 290–91 (James H. Chadbourn rev.1979) (discussing the basis for and long history of the adverse inference, as well as its general applications). In addition, the spoliation inference is much more limited in scope than the tort of intentional spoliation in that it is does not provide an award of damages, necessitate a judgment in favor of the opposing party, or even de-

pend on prejudice to the opposing party. *See* Wigmore, *supra,* § 290, at 217 ("The *inference* (supposing the failure of evidence not to be explained away) is of course that the tenor of the specific unproduced evidence would be *contrary to the party's case,* or at least would not support it. In other words, the inference does not affect indefinitely the merits of the whole cause, as it does when fraudulent conduct is involved, but affects specifically, and only, the evidence in question." (citation omitted)); *see also Schneider v. G. Guilliams, Inc.,* 976 S.W.2d 522, 526 (Mo.Ct.App.1998) (discussing the lack of a need for prejudice to the opposing party and stating that "[t]he adverse inference ... does not prove the opposing party's case"). Finally, we believe that such an instruction is appropriate because our recognition of a separate cause of action for intentional spoliation of evidence in *Coleman* was intended to supplement, rather than supplant, existing remedies. *Cf. Sweet v. Sisters of Providence,* 895 P.2d 484, 492–93 (Alaska 1995) (concluding that burden shifting on the issues of duty and breach on a claim of medical negligence due to a failure to maintain medical records provided an "adequate remedy" for a plaintiff given "insufficient evidence from which a reasonable person could conclude that [the spoliator] lost or destroyed ... nursing records with the intent to disrupt the ... prospective civil action").

> [T]he destruction or spoliation of evidence doctrine is itself flexible and versatile. Various courts have recognized it as an independent cause of action, a defense to recovery, an evidentiary inference or presumption, and as a discovery sanction. It is regarded as both a substantive rule of law and as a rule of evidence or procedure. Its application depends on the attendant circumstances.

*Klupt v. Krongard,* 126 Md.App. 179, 728 A.2d 727, 736 (1999).

## IV. Conclusion

{55} Under New Mexico's scheme of pure comparative fault, we believe that the doctrine of independent intervening cause does not apply to a plaintiff's negligence. Additionally, the jury instruction on indepen-

dent intervening cause, being repetitive of considerations of proximate cause and potentially confusing in light of New Mexico's use of several liability, shall no longer be used in cases involving multiple acts of negligence. In this case, the doctrine of independent intervening cause is inapplicable because EPEC presented no other cause that could reasonably be seen as breaking the chain of causation. Therefore, we conclude that the trial court erred in giving UJI 13–306, and we reverse the jury verdict and judgment in favor of EPEC. We also reverse the trial court's directed verdict in favor of EPEC on Torres's claim for punitive damages because reasonable minds could differ as to whether the cumulative actions of EPEC, including design, installation, and maintenance of the power pole, indicated recklessness with regard to the management of an inherently dangerous activity. Finally, we affirm the trial court's directed verdict on the claim of intentional spoliation of evidence because Torres failed to introduce evidence from which a reasonable juror could conclude that EPEC maliciously intended to injure Torres. We remand for a new trial on Torres's negligence claim.

{56} **IT IS SO ORDERED.**

BACA and MAES, JJ., concur.

FRANCHINI, J., concurring in part, dissenting in part.

{57} I concur in Part II and Part III(B) of the opinion regarding independent intervening causation and intentional spoliation of evidence, respectively.

{58} I do not concur in Part III(A) of the opinion regarding punitive damages. Punitive damages require " '*a positive element of conscious wrongdoing.*' " *Paiz,* 118 N.M. at 211, 880 P.2d at 308 (quoting Charles T. McCormick, *Handbook on the Law of Damages* § 79, at 280 (1935)). "There must be circumstances of aggravation or outrage, such as spite or 'malice,' or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may

be called willful or wanton." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 2, at 9–10 (5th ed.1984) (footnotes omitted) [hereinafter *Prosser & Keeton* ]. Because no evidence of such egregious behavior exists in this case, I would not subject EPEC to punitive damages.

{59} The principal cases cited by the majority, *Ferrellgas, Gonzales,* and *Saiz,* are all clearly distinguishable. In *Ferrellgas,* this court upheld a punitive damages award where the defendant not only negligently installed a propane conversion system in the trunk of a car, but also allowed the customer to pick up the vehicle knowing "the risk of harm of releasing a vehicle in that unsafe condition," and where, furthermore, the defendant "had done over 100 conversions without ever filing Form 6," a safety checklist required by the state inspector's office. 118 N.M. at 272, 881 P.2d at 17. We concluded that "the negligence of [Ferrellgas's employees] and regular violation of safety regulations by Ferrellgas amount[ed] to corporate indifference and reckless conduct." *Id.* Here, Torres can point to no similarly outrageous conduct on the part of EPEC.

{60} In *Gonzales,* the defendant's failure to warn patients of the well-documented risks of an eye implantation procedure was aggravated by the fact that the defendant knew its doctors "tended to underreport the number of complications on the follow-up reports that it did send in," 120 N.M. at 146, 899 P.2d at 589, and further aggravated by the fact that the defendant appointed as its medical monitor the creator of the flawed implant device, "even though he received royalties for each lens sold and was paid to actively promote the lens to hospitals across the nation." *Id.* Here, after a full-blown trial, Torres has brought no similarly aggravating circumstances to light. In my view, neither *Ferrellgas* nor *Gonzales* support the majority's decision today that the punitive damages question must go to the jury in a new trial on remand.

{61} Nor does *Saiz* support the majority opinion. In *Saiz,* the danger was not nearly as obvious as the one posed in this case. Instead of an overhead power line in full view, as here, a hidden and deadly peril existed: "The failure to install a smooth plas-

tic bushing, *required under the state electrical code*, where the buried insulated cable entered the metal conduit, ... caused an electrical short and the electrocution of Jerry Saiz." 113 N.M. at 392, 827 P.2d at 107. The *Saiz* court determined that a strict liability standard was appropriate in "the absence of a precaution made reasonably necessary in the face of the peculiar risks inherent" in running electrical cable at a high school football stadium, "where the public could be expected to be crowded closely together and where extensive physical contact with the electrical conduit running up the light pole was a certainty." *Id.* at 399–400, 827 P.2d at 114–15. Here, EPEC should not be held to a strict liability standard, but in my view, sending this case to the jury for punitive damages is equivalent to subjecting EPEC to the risk of strict liability.

{62} Decisions from other jurisdictions also illustrate that this is not a proper case for jury consideration of punitive damages. In *Potomac Elec. Power Co. v. Smith*, 79 Md.App. 591, 558 A.2d 768, 772–73, 778, 782 (1989), the defendant not only knew that the wooden crossbar on a utility pole was dangerously riddled with knots but also failed to replace it when one arm broke *and*, when the other arm broke, the defendant did not respond for more than a month to repeated calls that a live wire was down, even though the defendant knew the area was one of frequent pedestrian traffic by adults and children. Here Torres's evidence demonstrates no such positive elements of conscious wrongdoing on EPEC's part.

{63} This case is more like *Carroll Elec. Coop. Corp. v. Carlton*, 319 Ark. 555, 892 S.W.2d 496, 501 (1995), wherein the court affirmed a directed verdict for the defendant, stating

> There was no evidence tending to prove that CECC acted with actual malice. Nor was there evidence of conscious indifference to the consequences of its actions. The jury was justified in finding negligence in direct connection with the incident and perhaps in the general lack of any inspection program more rigorous than casually viewing the lines as CECC workers drove past. That, however, does not satisfy the criteria for punitive damages. Mere negligence, or even gross neg-

ligence, is not sufficient to justify punitive damages.

Here, where EPEC's inspection of the utility pole was much more comprehensive than CECC's, the district court's directed verdict should stand.

{64} By reading into EPEC's alleged acts and omissions the possibility of recklessness and a willful, wanton, and malicious intent, the majority opens the door for the jury to assess the utility with punitive damages for what is, at most, merely negligent conduct. In the words of Professors Prosser and Keeton, however, to support an award of punitive damages, "mere negligence is not enough, even though it is so extreme in degree as to be characterized as 'gross.'" *Prosser & Keeton* § 2 at 10. I am afraid that, by ignoring the unique and deeply troubling factual scenarios in which the *Ferrellgas* court discerned a "cavalier attitude toward[ ] safety regulations," 118 N.M. at 272, 881 P.2d at 17, and the *Gonzales* court lamented a "betrayal of the medical community," 120 N.M. at 146, 899 P.2d at 589, the majority unjustifiably expands the potential liabilities of *all* companies doing business in New Mexico. I would affirm the district court's directed verdict on the Torres's claim for punitive damages. The majority holding otherwise, I respectfully dissent.

MINZNER, C.J., concurs.